UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| NATALIE GORDON, Derivatively On Behalf of UNITED RENTALS, INC., ) ) | Civil Action No. |
| Plaintiff, ) ) ) | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF |
| vs. ) ) ) | CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT AND |
| WAYLAND R. HICKS, BRADLEY S. JACOBS, JOHN N. MILNE, MICHAEL J. KNEELAND, JOSEPH B. SHERK, CHRISTIAN M. WEYER, HOWARD L. CLARK, JR., RONALD M. DEFEO, MICHAEL S. GROSS, SINGLETON MCALLISTER, BRIAN D. MCAULEY, JOHN S. MCKINNEY, MARK SUWYN, GERALD TSAI, JR., ) ) ) ) ) ) ) ) ) ) ) | VIOLATIONS OF THE SARBANES-OXLEY ACT OF 2002 |
| Defendants, ) ) | |
| -and- ) ) ) | |
| UNITED RENTALS, INC., a Delaware corporation, ) ) ) | |
| Nominal Defendant. ) ) | JURY TRIAL DEMANDED |

Plaintiff, by her attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of United Rentals Inc. ("United Rentals" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and violations of the Sarbanes-Oxley Act of 2002 that occurred between October 23, 2003 and the present (the "Relevant Period") and that have caused substantial losses to United Rentals and other damages, such as to its reputation and goodwill.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive one to confer jurisdiction on this Court it would not otherwise have.

3.      This court has jurisdiction over this action pursuant to 28 U.S.C §1331 in that plaintiff's claims arise in part out of the laws of the United States, including the Sarbanes-Oxley Act of 2002.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

4.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with Connecticut so as to render the exercise of jurisdiction by the Connecticut courts permissible under traditional notions of fair play and substantial justice.

5.      Venue is proper in this Court because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to United Rentals

occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## SUMMARY OF THE ACTION

6.     United Rentals is an equipment rental company with a network of more than 730 rental locations in the United States, Canada and Mexico. In addition to renting equipment, the Company sells used rental equipment, acts as a dealer for new equipment and sells related merchandise and contractor supplies, parts and service. Its customers include construction and industrial companies, manufacturers, utilities, municipalities, homeowners and others.

7.     The true facts which were known by each of the defendants, but concealed from the public during the Relevant Period, were as follows:

(a)     That the Company, in an effort to generate a more favorable stock price and raise capital, manipulated its financial results through the use of restructuring charges, asset writedowns and debt refinancing;

(b)     That the Company improperly delayed recognition of bad accounts receivable;

(c)     That as a result of these manipulations, the Company's announced financial results were in violation of Generally Accepted Accounting Principles ("GAAP"); and

(d)     That the Company's financial results were materially inflated at all relevant times.

## THE PARTIES

8.     Plaintiff Natalie Gordon is, and was at times relevant hereto, an owner and holder of United Rentals common stock. Plaintiff is a citizen of New York.

9.     Nominal defendant United Rentals is a corporation organized and existing under the laws of the state of Delaware with its headquarters located at Five Greenwich Office Park, Greenwich, Connecticut. United Rentals is an equipment rental company with a network of more than 730 rental locations in the United States, Canada and Mexico. In addition to renting equipment, the Company sells used rental equipment, acts as a dealer for new equipment and sells related merchandise and contractor supplies, parts and service. Its customers include construction and industrial companies, manufacturers, utilities, municipalities, homeowners and others.

3

10.     Defendant Wayland R. Hicks ("Hicks") is the Chief Executive Officer ("CEO") of United Rentals, and has been since December 16, 2003. Hicks is also Vice Chairman and a director of United Rentals, and has been since 1998. Hicks previously served as Chief Operating Officer of United Rentals at all relevant times hereto, until December 2003. Because of Hicks' positions, he knew the adverse non public information about the business of United Rentals, as well as its accounting improprieties, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' (the "Board") meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Hicks participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. For FY:03, United Rentals paid defendant Hicks $800,900, in salary, bonus and other compensation. Hicks is a citizen of Connecticut.

11.     Defendant Bradley S. Jacobs ("Jacobs") is, and at all times relevant hereto was, Chairman of the Board of Directors of United Rentals. Jacobs previously served as CEO of United Rentals at all relevant times hereto, until December 15, 2003. Because of Jacobs' positions, he knew the adverse non public information about the business of United Rentals, as well as its accounting improprieties, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Jacobs participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:03, United Rentals paid defendant Jacobs $1,050,550, in salary, bonus and other compensation. Jacobs is a citizen of Connecticut.

12.     Defendant John N. Milne ("Milne") is, and at all times relevant hereto was, President, Chief Financial Officer ("CFO"), Chief Acquisitions Officers, Secretary, Vice Chairman of the Board, and a director of United Rentals. Because of Milne's positions, he knew the adverse non public information about the business of United Rentals, as well as its accounting improprieties,

4

finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Milne·participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:03, United Rentals paid defendant Milne $770,900, in salary, bonus and other compensation. Milne is a citizen of Connecticut.

13. Defendant Michael J. Kneeland ("Kneeland") is, and at all times relevant hereto was, Executive Vice President of Operations for United Rentals. Because of Kneeland's position, he knew the adverse non public information about the business of United Rentals, as well as its accounting improprieties, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Kneeland participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:03, United Rentals paid defendant Kneeland $416,500, in salary, bonus and other compensation. Kneeland is a citizen of Maryland.

14. Defendant Joseph B. Sherk ("Sherk") is, and at all times relevant hereto was, Corporate Controller of United Rentals. Because of Sherk's position, he knew the adverse non public information about the business of United Rentals, as well as its accounting improprieties, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Sherk participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Sherk is a citizen of Connecticut.

15. Defendant Christian M. Weyer ("Weyer") was a director of United Rentals at all times relevant hereto, until April 2004. Because of Weyer's position, he knew the adverse non

public information about the business of United Rentals, as well as its accounting improprieties, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Weyer participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Weyer sold 10,000 shares of United Rentals stock for proceeds of $178,860.00. Weyer is a citizen of California.

16.    Defendant Howard L. Clark, Jr. ("Clark") is a director of United Rentals and has been since April 2004. Because of Clark's position, he knew the adverse non public information about the business of United Rentals, as well as its accounting improprieties, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Clark participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Clark is a citizen of Connecticut.

17.    Defendant Ronald M. DeFeo ("DeFeo") was a director of United Rentals at all times relevant hereto until June 2005. Because of DeFeo's position, he knew the adverse non public information about the business of United Rentals, as well as its accounting improprieties, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, DeFeo participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. DeFeo is a citizen of Connecticut.

18.    Defendant Michael S. Gross ("Gross") is, and at all times relevant hereto was, a director of United Rentals. Because of Gross' position, he knew the adverse non public information

about the business of United Rentals, as well as its accounting improprieties, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Gross participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Gross is a citizen of Maryland.

19.     Defendant Singleton McAllister ("McAllister") is a director of United Rentals and has been since April 2004. Because of McAllister's position, she knew the adverse non public information about the business of United Rentals, as well as its accounting improprieties, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, McAllister participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. McAllister is a citizen of Maryland.

20.     Defendant Brian D. McAuley ("McAuley") is a director of United Rentals and has been since April 2004. Because of McAuley's position, he knew the adverse non public information about the business of United Rentals, as well as its accounting improprieties, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, McAuley participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. McAuley is a citizen of New Jersey.

21.     Defendant John S. McKinney ("McKinney") is, and at all times relevant hereto was, a director of United Rentals. Because of McKinney's position, he knew the adverse non public information about the business of United Rentals, as well as its accounting improprieties, finances,

markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, McKinney participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. McKinney is a citizen of California.

22.     Defendant Mark Suwyn ("Suwyn") is a director of United Rentals and has been since April 2004. Because of Suwyn's position, he knew the adverse non public information about the business of United Rentals, as well as its accounting improprieties, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Suwyn participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Suwyn is a citizen of Oregon.

23.     Defendant Gerald Tsai, Jr. ("Tsai") is, and at all times relevant hereto was, a director of United Rentals. Because of Tsai's position, he knew the adverse non public information about the business of United Rentals, as well as its accounting improprieties, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Tsai participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Tsai is a citizen of Connecticut.

24.     The defendants identified in ¶¶10-12, 15-23 are referred to herein as the "Director Defendants." The defendants identified in ¶¶10-14 are referred to herein as the "Officer Defendants." The defendant identified in ¶15 is referred to herein as the "Insider Selling

Defendant." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendant are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

25.     By reason of their positions as officers, directors and/or fiduciaries of United Rentals and because of their ability to control the business and corporate affairs of United Rentals, the Individual Defendants owed United Rentals and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage United Rentals in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of United Rentals and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

26.     Each director and officer of the Company owes to United Rentals and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

27.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of United Rentals, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with United Rentals, each of the Individual Defendants had access to adverse non public information about the financial condition, operations, and improper representations of United Rentals.

28.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of United Rentals, and was at all times acting within the course and scope of such agency.

29.     To discharge their duties, the officers and directors of United Rentals were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of United Rentals were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how United Rentals conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

30.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their

obligations as directors and officers of United Rentals, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of United Rentals' Board during the Relevant Period.

31.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein infra, and by failing to prevent the Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action lawsuits that allege violations of federal securities laws.  As a result, United Rentals has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)    Costs incurred in investigating and defending United Rentals and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

32.    Moreover, these actions have irreparably damaged United Rentals' corporate image and goodwill.  For at least the foreseeable future, United Rentals will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that United Rentals' ability to raise equity capital or debt on favorable terms in the future is now impaired.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

33.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the

wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

34.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at United Rentals and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of United Rentals, regarding the Individual Defendants' management of United Rentals' operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

35.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least October 2003 and continuing thereafter.  During this time the Individual Defendants caused the Company to conceal the true fact that United Rentals was misrepresenting its financial results.  In addition, defendants also made other specific, false statements about United Rentals' financial performance and future business prospects, as alleged herein.

36.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of United Rentals common stock so they could: (i) dispose of over $178,860.00 of their personally held stock; (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof; and (iii) more effectively raise over $1

billion in Senior Notes and Convertible Senior Subordinated Notes through a refinancing plan of existing credit facilities.

37.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board of Directors, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

38.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

39.     United Rentals is an equipment rental company with a network of more than 730 rental locations in the United States, Canada and Mexico. In addition to renting equipment, the Company sells used rental equipment, acts as a dealer for new equipment and sells related merchandise and contractor supplies, parts and service. Its customers include construction and industrial companies, manufacturers, utilities, municipalities, homeowners and others.

## IMPROPER STATEMENTS

40.     The Individual Defendants, by their fiduciary duties of care, good faith and loyalty owed to United Rentals a duty to insure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements. This material non-public information included the accuracy of the Company's accounting. Furthermore, defendants Gross, Tsai, Suwyn and McAuley, as members of the Audit Committee, had a special duty to know and understand this material information as set out in the

Audit Committee's charter which provides that the Audit Committee is responsible for discussing the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies. Defendants Hicks, Jacobs, Milne, Kneeland and Sherk, as officers of United Rentals, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, defendants Hicks, Jacobs, Milne, Weyer, Clark, DeFeo, Gross, McAllister, McAuley, McKinney, Suwyn and Tsai as directors of United Rentals had ample opportunity to discuss this material information with management and fellow directors at any of the Board meetings that occurred during the Relevant Period as well as at meetings of committees of the Board. Despite these duties, the Individual Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by United Rentals to the investing public and the Company's shareholders during the Relevant Period.

41.     On October 23, 2003, the Company issued a press release entitled "United Rentals Announces Third Quarter Results." The press release stated in part:

> The company reported revenues of $805.1 million, compared to $783.1 million for the third quarter of 2002. Rental revenues were 78% of total revenues, sales of rental equipment were 5%, and sales of equipment and merchandise and other revenues were 17%. Same-store rental revenues increased 4.7% year-over-year, and rental rates rose 3.4% year-over-year. Equipment utilization was 65.1% in this year's third quarter compared to 64.1% in the same period last year, and sharing of equipment among branches accounted for 12.9% of rental revenues compared to 11.8% in last year's third quarter.

> Net income for the quarter was $31.9 million and earnings per diluted share was $0.34. This includes a non-cash charge of $11.7 million ($10.2 million after-tax or $0.10 per diluted share) attributable to the vesting of restricted shares granted to senior executives in 2001. Vesting was triggered this quarter by the increase in the company's stock price. Excluding this charge, net income for the quarter would have been $42.0 million and earnings per diluted share $0.44, compared with net income of $40.8 million and earnings per diluted share of $0.43 for the same period last year.

> Bradley Jacobs, chairman and chief executive officer, said, "This quarter's increase in rental rates was achieved despite continued softness in our end markets. We expect that the emerging economic recovery should lead to improved business conditions, but the timing of a significant rebound in non-residential construction remains difficult to forecast."

> Wayland Hicks, chief operating officer, added, "We have been making concerted efforts to improve our rates by focusing on effective pricing practices. While there remains a lot more we can do, we are pleased with this quarter's increase and the related improvements in utilization and same-store rental revenues."

For the nine-month period ended September 30, 2003, revenues were $2.13 billion, compared to $2.13 billion for the first nine months of 2002. Net income was $46.6 million and earnings per diluted share was $0.50 for the nine-month period ended September 30, 2003, compared with net income as adjusted of $99.5 million and earnings per diluted share as adjusted of $1.07 for the same period last year. The results for 2002 have been adjusted to exclude the effect of a change in accounting principle relating to goodwill that resulted in a non-cash charge, net of tax, of $288.3 million.

42.     On October 28, 2003, the Company issued a press release entitled "United Rentals Prices Convertible Senior Subordinated Notes Offering and Announces Planned Offering of Senior Subordinated Notes." The press release stated in part:

> United Rentals, Inc. announced today that it priced an offering of $125 million aggregate principal amount of 1 7/8% Convertible Senior Subordinated Notes due 2023. The company has granted the initial purchasers of the notes a 30-day option to purchase up to an additional $18.75 million aggregate principal amount of notes.
>
> The notes will be convertible, under certain circumstances, into the company's common stock at an initial conversion rate of 38.952 shares per $1,000 principal amount of notes. This is equivalent to a conversion price of approximately $25.67 per share. Holders of the notes will have the ability to require the company to repurchase the notes in cash, in whole or in part, in October 2010 and specified times thereafter. The repurchase price will be 100% of the principal amount of the notes plus accrued and unpaid interest.
>
> The company plans to use the net proceeds of the convertible notes offering to buy out existing equipment leases and/or for general corporate purposes.
>
> The company also announced that it expects to proceed with an additional offering of approximately $450 million aggregate principal amount of non-convertible senior subordinated notes. The company expects to use the net proceeds from this offering to redeem $205 million face amount of outstanding 8.80% Senior Subordinated Notes due 2008 and $200 million face amount of outstanding 9 1/2% Senior Subordinated Notes due 2008, and for general corporate purposes. Completion of this additional offering will be conditioned on the company obtaining an amendment to its senior credit facility allowing the planned redemption of outstanding notes.

43.     On October 29, 2003, the Company issued a press release entitled "United Rentals Senior Subordinated Notes Offering." The press release stated in part:

> The size of the offering was increased to $525 million from the previously announced $450 million. The notes will bear interest at 7.75% and be due in 2013.
>
> The company expects to use approximately $424 million of the offering net proceeds to redeem $205 million face amount of outstanding 8.80% Senior Subordinated Notes due 2008 and $200 million face amount of outstanding 9 1/2% Senior Subordinated Notes due 2008. The balance will be used to buy out existing equipment leases and/or for general corporate purposes. Completion of this offering is conditioned on the company obtaining an amendment to its senior credit facility allowing the planned redemption of outstanding notes.

44.     On November 14, 2003, United Rentals filed with the SEC its quarterly report on
Form 10-Q. The Company's Form 10-Q was signed by defendants Milne and Sherk and reaffirmed
the Company's previously announced financial results. Moreover, the Company represented the
following:

> The Consolidated Financial Statements of the Company included herein are
> unaudited and, in the opinion of management, such financial statements reflect all
> adjustments, consisting only of normal recurring adjustments, necessary to present
> fairly the results of the interim periods presented. Interim financial statements do not
> require all disclosures normally presented in year-end financial statements, and,
> accordingly, certain disclosures have been omitted.

45.     Additionally, the Company's Form 10-Q included the following Certifications signed
by each of defendants Jacobs and Milne:

> 2.     Based on my knowledge, this report does not contain any untrue
> statement of a material fact or omit to state a material fact necessary to make the
> statements made, in light of the circumstances under which such statements were
> made, not misleading with respect to the period covered by this report;

> 3.     Based on my knowledge, the financial statements, and other financial
> information included in this report, fairly present in all material respects the financial
> condition, results of operations and cash flows of the registrants as of, and for, the
> periods presented in this report.

46.     On January 16, 2004, the Company issued a press release entitled "United Rentals
Announces Refinancing and Related Cash Tender Offer and Consent Solicitation for Outstanding
10¾% Senior Notes Due 2008." The press release stated in part:

> United Rentals, Inc. announced today that it intends to refinance a substantial portion
> of its outstanding indebtedness over the next several weeks. The refinancing was
> being undertaken to take advantage of current market opportunities that should allow
> the Company to reduce its interest expense and extend the maturities of a substantial
> portion of its debt.

> As part of the refinancing, the company expects to replace its existing senior
> secured credit facility with a new secured credit facility and refinance outstanding
> senior and subordinated notes. The refinancing will be funded primarily through the
> issuance of new senior and subordinated notes and funds available under the new
> secured credit facility. The debt expected to be refinanced includes: (i) $640 million
> of term loans, (ii) all borrowings under the company's revolving credit facility, (iii)
> $860 million principal amount of 10 3/4% Senior Notes due 2008, (iv) $300 million
> principal amount of 9 1/4% Senior Subordinated Notes due 2009 and (v) $250
> million principal amount of 9% Senior Subordinated Notes due 2009.

> The company also announced that, as part of the refinancing, it has
> commenced a cash tender offer and consent solicitation for all of its outstanding 10
> 3/4% Senior Notes due 2008 ("10 3/4% Notes"). These notes are comprised of (i)
> $650 million principal amount of 10 3/4% Notes issued under an indenture dated

April 20, 2001 (CUSIP No. 911365AB0) and (ii) $210 million principal amount of 10 3/4% Notes issued under an indenture dated December 24, 2002 (CUSIP No. 911365AE4).

47.     On January 22, 2004, the Company issued a press release entitled "United Rentals Announces Note Offerings."  The press release stated in part:

> United Rentals, Inc. announced today that it will offer for sale $1 billion of senior notes and $375 million of senior subordinated notes.  These offerings are part of the company's previously announced plan to refinance a substantial portion of its outstanding indebtedness in order to lower interest expense and extend maturities.
>
> The company also confirmed that it is proceeding with its previously announced plan to replace its existing senior secured credit facility with a new senior secured credit facility.  The new facility is expected to include: (i) a $750 million term loan, (ii) a $650 million revolving credit facility that may be used for loans and/or letters of credit (up to a maximum of $250 million for letters of credit) and (iii) a $150 million institutional letter of credit facility that will provide additional letter of credit capacity.
>
> The company expects to use the proceeds from the note offerings, together with funds expected to be available under the new credit facility, to: (i) redeem $300 million principal amount of outstanding 9 1/4% Senior Subordinated Notes due 2009, (ii) repay $639 million of term loans and approximately $52 million of other borrowings outstanding under the company's existing credit facility, (iii) repurchase up to $860 million principal amount of outstanding 10 3/4% Senior Notes due 2008 pursuant to the company's previously announced tender offer for such notes, (iv) redeem $250 million principal amount of outstanding 9% Senior Subordinated Notes due 2009 and (v) pay related redemption and repurchase premiums and transaction costs.
>
> The closing of the senior notes offering, but not the senior subordinated notes offering, will be conditioned on: (i) the company obtaining the new credit facility and (ii) at least $516 million aggregate principal amount of outstanding 10 3/4% Senior Notes due 2008 being tendered to the company pursuant to the company's previously announced tender offer.

48.     On February 17, 2004, United Rentals announced that it had completed its offerings of $1 billion of 6 1/2% Senior Notes Due 2012 and $375 million of 7% Senior Subordinated Notes Due 2014.  The Company also announced that it obtained a new senior secured credit facility.  The Company was using the proceeds from the note offerings, together with borrowings available under the new credit facility, to complete the refinancing of $2.1 billion of its debt in accordance with its previously announced plan.  The refinancing would reduce the Company's interest expense and extend the maturities of a substantial portion of the company's debt.  More specifically, the Company stated:

As part of the refinancing, the company (i) repaid $639 million of term loans and $52 million of borrowings that were outstanding under the company's old credit facility, (ii) repurchased $845 million principal amount of its 10 3/4% Senior Notes due 2008 (which represented more than 98% of the total outstanding) pursuant to its previously announced tender offer, (iii) called for redemption $300 million principal amount of its outstanding 9 1/4% Senior Subordinated Notes due 2009 and (iv) will call for redemption $250 million principal amount of its outstanding 9% Senior Subordinated Notes due 2009. The redemption of the 9 ¼% Senior Subordinated Notes is expected to be completed on February 27, 2004, and the redemption of the 9% Senior Subordinated Notes is expected to be completed on April 1, 2004.

The company's new senior secured credit facility replaces the facility the company previously had in place. The new facility includes (i) a $750 million term loan, (ii) a $650 million revolving credit facility that may be used for loans and/or letters of credit (up to a maximum of $250 million for letters of credit) and (iii) a $150 million institutional letter of credit facility that provides additional letter of credit capacity. The term loan will be obtained in two draws. An initial draw of $550 million was obtained upon the closing of the credit facility, and an additional $200 million is expected to be obtained on April 1, 2004.

49.     On February 25, 2004, the Company issued a press release entitled "United Rentals Reports Results for Fourth Quarter and Full Year 2003." The press release stated in part:

For the full year 2003, the company reported revenues of $2.87 billion, an increase of 1.6% compared with $2.82 billion for 2002. Same-store rental revenues for the full year increased 3.7% from the prior year and rental rates increased 2.1%. Revenues generated by sharing equipment between branches improved to 11.5% of rental revenues compared with 11.3% in 2002. Equipment utilization for the full year 2003 was essentially flat with the prior year at 57.1% compared with 57.0% in 2002.

Adjusted net income for the full year was $71.8 million and adjusted diluted earnings per share was $0.75 compared with adjusted net income of $107.6 million and adjusted diluted earnings per share of $1.11 in 2002. The adjusted net income and diluted earnings per share exclude the charges described below as well as the increase to diluted earnings per share from the company's repurchases of its preferred securities.

Wayland Hicks, vice chairman and chief executive officer, said, "Our intense focus on rental rates began to show real results in 2003. We saw our first annual rate improvement since 2000, and our 5.6% rate increase in the fourth quarter was the highest quarterly increase in the history of our company. Furthermore, we achieved these gains without adversely affecting utilization. We also increased same-store rental volume and added 200,000 new customers, bringing our base to 1.9 million."

"Although we outpaced our end markets, the fourth quarter and full year results were negatively impacted by higher operating costs as well as continued weakness in market demand. According to Department of Commerce data, private non-residential construction declined 6% in 2003 following a decline of 13% in 2002. In addition, government spending on road and highway construction remained sluggish."

Hicks continued, "Our 2004 plan assumes private non-residential construction will be relatively flat. However, we expect to substantially improve our profitability through a combination of lower interest expense due to our recent refinancings, higher rental rates and contractor supply sales growth. We anticipate diluted earnings per share, excluding charges, of $1.00 to $1.10 in 2004."

"Beyond 2004, a sustained rebound in our principal end markets has the potential to drive earnings significantly higher."

The results above for the fourth quarter and full year 2003 exclude aggregate charges, net of tax, of $320.2 million and $330.4 million, respectively. These charges relate to goodwill impairment, buy-out of equipment leases, debt refinancing, notes receivables write-off, and, in the case of the full year results, vesting of restricted shares granted to executives in 2001. The results above for the fourth quarter and full year 2002 exclude aggregate charges, net of tax, of $217.1 million and $505.4 million, respectively. These charges relate to goodwill impairment, restructuring costs, debt refinancing, and, in the case of the full year results, a change in accounting principle relating to goodwill.

The results for the full year 2003 and the fourth quarter and full year 2002 also exclude the positive impacts on diluted earnings per share of repurchases by the company of its 6 1/2% convertible quarterly income preferred securities. These repurchases added $0.01 to diluted earnings per share for the full year 2003, $0.39 to diluted earnings per share for the fourth quarter of 2002 and $0.47 for the full year 2002.

Taking into account the excluded items, the company reported GAAP results as follows: a net loss of $305.1 million and a loss available to common stockholders per diluted share of $3.96 for the fourth quarter 2003; a net loss of $258.6 million and a loss available to common stockholders per diluted share of $3.35 for the full year 2003; a net loss of $209.0 million and a loss available to common stockholders per diluted share of $2.33 for the fourth quarter 2002; and a net loss of $397.8 million and a loss available to common stockholders per diluted share of $4.78 for the full year 2002.

50.     On March 15, 2004 United Rentals filed with the SEC its annual report on Form 10-K. The Company's Form 10-K was signed by the Individual Defendants and reaffirmed the Company's previously announced financial results. Additionally, the Company's Form 10-K contained the following opinion from its independent auditors:

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of United Rentals, Inc. at December 31, 2003 and 2002, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2003 in conformity with accounting principles generally accepted in the United States.

51.     Moreover, the Company's Form 10-K included the following Certifications signed by each of defendants Hicks and Milne:

2.       Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the

statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

      3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report; […]

52.    On April 22, 2004, the Company issued a press release entitled "United Rentals Reports First Quarter 2004 Results." The press release stated in part:

United Rentals, Inc. today reported first quarter revenues of $645 million, an increase of 8.9% compared with $592 million for the first quarter of 2003. Adjusted operating income for the first quarter of 2004 was $39.9 million compared with operating income of $40.2 million for the first quarter of 2003. The adjusted net loss for the first quarter of 2004 was $5.9 million and the adjusted loss per share was $0.08 compared with a net loss of $8.7 million and a loss per share of $0.11 for the first quarter of 2003. The adjusted results for the first quarter of 2004 exclude the charges described below.

Dollar utilization for the first quarter of 2004 was 49.6%, an increase of 3.0 percentage points from the first quarter of 2003. The size of the rental fleet, as measured by the original equipment cost, was $3.7 billion at the end of the first quarter of 2004, essentially the same as at the end of the first quarter of 2003. However, the average fleet size during the first quarter of 2004 was 2% lower than during the first quarter of 2003.

\* \* \*

**General Rentals**

First quarter revenues for the general rentals segment were $599 million, an increase of 11.2% compared with $539 million for the first quarter of 2003. Rental rates for the first quarter increased 6.5% and same-store rental revenues increased 8.5% from the first quarter of 2003. Segment operating income for the first quarter was $53.7 million compared with $48.7 million for the first quarter of 2003.

**Traffic Control**

First quarter revenues for the traffic control segment were $45 million, a decline of 14.5% compared with $53 million for the first quarter of 2003. Same-store rental revenues in the first quarter declined 11.7% from the first quarter of 2003. The segment operating loss for the first quarter was $13.8 million compared with $8.4 million for the first quarter of 2003.

**CEO Comments and Outlook**

Wayland Hicks, vice chairman and chief executive officer said, "Adjusted results for the seasonally-slow first quarter improved from last year and were better than our expectations. The improvement was driven by the 6.5% increase in rental rates as well as a 34% increase in contractor supply sales in our general rentals segment. The positive impact of these factors offset higher general rentals operating costs and declining revenues and profits in our traffic control segment. We also benefited from lower interest expense due to lower interest rates."

Hicks continued, "Following three and a half years of continued decline in our primary end market, first quarter data suggest that private non-residential construction has almost leveled off. For the full year we continue to anticipate diluted earnings per share, excluding charges, of $1.00 to $1.10. However, we're beginning to sense more optimism from our customers that their business has bottomed out and is beginning to turn. If business conditions improve as we go through the year, we would expect better results."

"Beyond 2004, a sustained rebound in private non-residential construction has the potential to drive revenues significantly higher. As that happens, our substantial operating leverage should allow us to grow earnings much faster than revenues."

**GAAP Results and Other Information**

The adjusted net loss data for the first quarter of 2004 excludes $95.2 million of charges, net of tax, relating to the debt refinancing completed in the first quarter of 2004 and a $5.5 million charge, net of tax, for the vesting of restricted shares granted to executives in 2001. The segment operating income and loss data for the first quarter of 2004 exclude the $7.0 million charge for the vesting of restricted shares which has not been allocated to any segment.

After taking into account the excluded items, the company reported GAAP results for the first quarter as follows: operating income of $32.9 million, a net loss of $106.6 million, and a loss of $1.38 per share.

The projected results above for 2004 exclude the first quarter charges described above, costs related to debt refinancing incurred in the second quarter (approximately $11.5 million) and any non-cash goodwill write-offs and other special charges that may be required.

53.     On May 10, 2004, United Rentals filed with the SEC its quarterly report on Form 10-Q. The Company's Form 10-Q was signed by defendants Milne and Sherk and reaffirmed the Company's previously announced financial results. Moreover, the Company represented the following:

The Consolidated Financial Statements of the Company included herein are unaudited and, in the opinion of management, such financial statements reflect all adjustments, consisting only of normal recurring adjustments, necessary to present fairly the results of the interim periods presented. Interim financial statements do not require all disclosures normally presented in year-end financial statements, and, accordingly, certain disclosures have been omitted.

54.     Additionally, the Company's Form 10-Q included the following Certifications signed by each of defendants Hicks and Milne:

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

21

3.      Based on my knowledge, the financial statements, and other financial information included to this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report; […]

55.      On July 21, 2004, the Company issued a press release entitled "United Rentals Reports Second Quarter Results and Raises 2004 Outlook." The press release stated in part:

United Rentals, Inc. today reported second quarter revenues of $776.0 million, an increase of 6.6% compared with $728.1 million for the second quarter of 2003.  Operating income for the second quarter of 2004 was $107.1 million, an increase of 13.2% compared with $94.6 million for the second quarter of 2003. Adjusted net income for the second quarter of 2004 was $41.5 million and adjusted diluted earnings per share was $0.42 compared with net income of $23.4 million and diluted earnings per share of $0.25 for the second quarter of 2003.  After recognizing a $6.5 million charge, net of tax, relating to the debt refinancing completed in the second quarter of 2004, the company reported GAAP net income of $35.0 million and GAAP diluted earnings per share of $0.36.

\*   \*   \*

**CEO Comments and Outlook**

Wayland Hicks, chief executive officer said, "Our adjusted diluted earnings per share this quarter were up 68% from last year's second quarter and exceeded our expectations.  These results reflected the strong operating performance in our general rentals segment and a substantial reduction in interest expense due to recent refinancings, partially offset by disappointing results in traffic control."

"In general rentals, the 11.9% increase in total revenues included a 9.6% increase in same store rental revenues, which was largely driven by our success in raising rental rates by 7.9%.  This performance significantly outpaced our principal end market, private non-residential construction, which was up only slightly during the first five months of 2004.  The impact of the revenue growth on profitability was enhanced by our operating leverage, resulting in general rentals operating income growth of 33.6%."

Hicks continued, "As a result of our positive rental rate trend and lower interest expense, we are raising our full year outlook for diluted earnings per share, excluding charges, to $1.20 from the previous range of $1.00 to $1.10."

56.      On August 9, 2004, United Rentals filed with the SEC its quarterly report on Form 10-Q.  The Company's Form 10-Q was signed by defendants Milne and Sherk and reaffirmed the Company's previously announced financial results and represented the following:

The Consolidated Financial Statements of the Company included herein are unaudited and, in the opinion of management, such financial statements reflect all adjustments, consisting only of normal recurring adjustments, necessary to present fairly the results of the interim periods presented.  Interim financial statements do not require all disclosures normally presented in year-end financial statements, and, accordingly, certain disclosures have been omitted.

57.     Additionally, the Company's Form 10-Q included the following Certifications signed by each of defendants Hicks and Milne:

> 2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report; [...]

### THE TRUTH BEGINS TO EMERGE

58.     On August 30, 2004, the Company issued a press release entitled "United Rentals to Cooperate with SEC Inquiry." United Rentals announced that it had received notice that the SEC was conducting a non-public, fact-finding inquiry of the Company. The notice was accompanied by a subpoena requesting the production of documents relating to certain of the Company's accounting records. United Rentals stated it "intends to cooperate fully with the SEC."

59.     On August 30, 2004, *Bloomberg* ran an article commenting on the SEC probe that stated in part:

> United Rentals Inc., North America's largest equipment-rental company, said it received a subpoena from the U.S. Securities and Exchange Commission for some of its accounting records. Its shares fell 22 percent.

> The SEC is conducting a "fact-finding" inquiry and didn't specify the purpose of the search, Greenwich, Connecticut-based United Rentals said. The company is cooperating with the SEC and said the inquiry doesn't include charges of wrongdoing. SEC spokesman John Nester declined to comment on the subpoena.

> The SEC may be investigating the way United Rentals accounts for $495.1 million in accounts receivables as of June 30 or for goodwill, said Sean Egan, managing director of EJR Research in Haverford, Pennsylvania.

> "Those are some of [the] items that stick out as needing some attention," Egan said in an interview. "What we've seen with other companies is that they delay recognition of bad accounts receivable. There's no evidence that that's the case here, but that's an area that can be manipulated. Likewise with goodwill."

> Egan said he doesn't own United Rentals shares or bonds. The ratings firm has a "BB" rating on the company's debt.

> Shares of United Rentals fell $4.39 to $16 as of 4 p.m. in New York Stock Exchange composite trading. The shares have fallen 17 percent this year.

**Meeting with SEC**