United Rentals spokesman Chuck Wessendorf said the company is scheduling a meeting with the SEC and hasn't yet turned over the accounting records.

"We won't know (what records to disclose) until we talk to the SEC," Wessendorf said in an interview.  He declined to be more specific.

The company's chief executive officer and co-founder, Bradley Jacobs, resigned last year and was replaced by Vice Chairman Wayland Hicks.  The company had net losses in 2003 and 2002 because of a slowdown in non-residential and highway construction and lower rental prices.

60.    News of the SEC inquiry shocked the market.  Shares of United Rentals fell 21.53 percent, to close at $16.00 per share on August 30, 2004 on unusually heavy trading volume.

61.    On August 31, 2004, CBS *MarketWatch* issued a press release entitled "United Rentals Extends Stock Slump after SEC Inquiry."  The press release stated in part:

United Rentals' stock lost more ground Tuesday in the wake of news that the Securities and Exchange Commission requested accounting documents from the company.

Shares of Greenwich, Conn.-based United Rentals, which dropped more than 21 percent in the previous session, lost another $1.31, or 8.2 percent, to $14.69 in volume of 6 million shares.

* * *

"*With our long-standing concerns about United Rentals' financial reporting, we view a broad SEC investigation as more of a concern versus a more specific inquiry*."

Smith Barney said the company's near-term business prospects appear to be improving due to rising rental rates, but said it remains cautious about the company's long-term financial position.

According to the-research firm, United Rentals over eight years has generated a negative $81 million in free cash flow.

62.    On September 28, 2004, United Rentals filed with the SEC a Form 8-K which, among other items, released the following:

As previously disclosed in the Company's 10-Q report for the quarter ended June 30, 2004, the goodwill balance associated with the Company's traffic control business amounted to $140.5 million as of the end of such quarter.  The Company is continuing to see weakness in its traffic control business during the third quarter and, as a result, believes it likely that it will record a significant non-cash goodwill impairment charge in this period.  Although the Company has not yet completed its analysis and, accordingly, cannot at this time quantify the amount of such write-off, it expects that such write-off is likely to have a material adverse affect on its results of operations for the third quarter and full-year 2004.

63.     On March 14, 2005, the Company issued a press release entitled "United Rentals Expects to Meet or Exceed Its 2004 Outlook; Delays Form 10-K Filing; Releases Selected Unaudited 2004 Financial Data; Announces Restatement of Pre-2004 Results to Reduce Income Tax Expense." The press release provided in relevant part:

> The company will delay finalizing its 2004 results and filing its Report on Form 10-K to allow additional time to review matters relating to the previously announced SEC fact-finding inquiry. The company believes this delay will extend beyond the Form 10-K due date, including the 15-day extension period....

> \* \* \*

> During testing of the company's internal controls, as required by Section 404 of the Sarbanes-Oxley Act, the company determined that the provision for income taxes was higher than required for periods prior to 2004. The company has not finally determined the impact this will have on specific periods, but estimates the correction of this will result in a decrease in the provision for income taxes for prior years by a total of approximately $25 million, with a corresponding increase in net income.

> The company expects that it will restate its financial statements for the years 1999 through 2003 to correct the income tax provision. Accordingly, investors are cautioned not to rely on the company's historical financial statements. For additional information, please refer to the company's Current Report on Form 8-K filed with the SEC on March 14, 2005.

> The company has determined that the control deficiencies that resulted in the income tax provision being higher than required represented a material weakness in the company's internal controls over financial reporting at December 31, 2004. The company believes that it has taken adequate measures to remedy this weakness.

> As previously reported, the company identified a material weakness in the third quarter partially relating to its self-insurance reserve estimation and evaluation process. The company is conducting additional testing of the process and reserve levels in 2004 and prior periods.

> The company is also evaluating whether a material weakness exists relating to a deficiency in reconciling physical inventory quantities to accounting records for certain types of bulk rental equipment inventory, which had an unreconciled difference of approximately $4 million.

> The company does not believe that any deficiency that has been identified, including the ones noted above, would adversely impact the 2004 outlook or the selected unaudited financial data provided in this press release. However, the company's evaluation and testing of internal controls, including testing of any remediation of deficiencies, has not yet been completed. There can be no assurance as to the outcome of this testing or that additional material weaknesses will not be identified or adjustments required.

64.     On July 14, 2005, the Company issued a press release entitled "United Rentals Board Determines John Milne, President and CFO, Failed to Perform Duties." The press release provided in relevant part:

United Rentals, Inc. today announced that its board of directors determined that John Milne, the company's president and CFO, failed to perform his duties and this failure would constitute cause for termination if not cured in accordance with his employment agreement. This action was taken on the recommendation of the special committee of the board reviewing matters relating to the previously disclosed SEC inquiry of the company, after Mr. Milne informed the committee he was not willing at this time to respond to the committee's questions. The board notified Mr. Milne that, to the extent his failure of performance may be curable, he would be afforded the thirty-day cure period provided by his employment agreement.

The company also provided an update on the special committee's review. In addition, the company provided updates on the previously disclosed self-insurance reserve review and income tax restatement.

The company also affirmed previous diluted earnings per share expectations for full year 2005 of $1.60 to $1.70.

### Update on Special Committee Review Relating to SEC Inquiry

In the years 2000, 2001, and 2002, the company was party to several short-term, equipment sale-leaseback transactions that resulted in the company reporting aggregate gross profit from these transactions of $12.5 million, $20.2 million and $1.5 million in those respective years. Although no final conclusion has been reached, the special committee has developed information that suggests the accounting for at least some of these transactions was incorrect. The special committee is continuing to review these transactions as part of its broader review relating to the SEC inquiry. As previously disclosed, the SEC inquiry appears to relate to a broad range of the company's accounting practices and is not confined to a specific period or the matters discussed in this release.

### Update on Other Matters

Self-Insurance Reserve Restatement Expected

As previously announced, the company is reviewing its self-insurance reserve recorded in 2004 and prior years. The company retained an independent actuary to assist with this matter. Based on work completed to date, the company has concluded that, although the reserve level at year-end 2004 is appropriate, a portion of the reserve recorded in 2003 and 2004 should have been recorded in prior periods. As a result, the expense associated with the self-insurance reserve was too high in 2003 and 2004 and too low in 2002 and prior years.

The company is presently quantifying by reporting period the financial restatement necessary. ***When this review is completed, the company expects to restate its financial statements for 2000 through 2003 and the first nine months of 2004 to correct the expense associated with the self-insurance reserve.*** This restatement will have a positive impact on pre-tax results for 2003 and 2004 and a negative impact on pre-tax results for prior years.

***As previously announced, in the third quarter of 2004 the company identified a material weakness relating partially to its self-insurance reserve estimation and evaluation process.*** Self-insurance reserves reflect the company's estimate of the liability associated with workers' compensation claims and claims by third parties for damage or injury caused by the company. The company subsequently retained an independent actuary to assist in reviewing its historical reserve levels. The company has determined that deficiencies relating to its self-

26

insurance reserve estimation process represented a material weakness in the company's internal control over financial reporting at December 31, 2004. The company believes that it has taken adequate measures to remedy this weakness.

Update on Previously Announced Income Tax Restatement

The company announced in March 2005 that it expected to restate its financial statements for years prior to 2004 to correct the provision for income taxes. The company's initial estimate was that this restatement would decrease the provision for income taxes by a total of approximately $25 million for years prior to 2004. Subsequently, the company determined that additional analysis is required to quantify the restatement for periods prior to 2004. Accordingly, the company is withdrawing its prior estimates relating to this matter. The company continues to believe the restatement is likely to decrease aggregate income tax expense for periods prior to 2004, although the expense in particular periods could increase. Further analysis is required to confirm this conclusion.

The company believes that this restatement will not impact 2004.

Caution on Historical Financial Statements

*In view of the expected restatements for income tax and self insurance, as well as the matters discussed above relating to certain sale-leaseback transactions, investors are cautioned not to rely on the company's historical financial statements.*

65.    Also on July 14, 2005, *Reuters* published an article entitled "United Rentals says president/CFO failed to perform." The article stated in part:

United Rentals Inc., which last year disclosed a regulatory probe of its accounting, on Thursday said its board of directors found that President and Chief Financial Officer John Milne had failed to perform his duties and could be fired.

Milne has refused to answer questions from a special committee that has been reviewing accounting related to a Securities and Exchange Commission inquiry, the company said.

A spokesman for Milne said his lawyers have advised him it would be "careless" for him to meet with the committee to discuss matters that occurred several years ago.

The world's largest equipment rental company said that Milne's failure to answer the committee's questions will be cause for termination if not rectified within 30 days.

"If he were to cooperate with the special committee, the board would likely meet again to determine whether he has performed his duties properly," said United Rentals spokesman Chuck Wessendorf.

Shares of United Rentals fell 9 percent in early afternoon trade. The company said it expects to restate results for the years 2000 to 2003, and for the first nine months of 2004. It affirmed its 2005 full-year forecast.

United Rentals said the SEC inquiry is not limited to the period or topics discussed in its Thursday press release, which included various accounting matters.

27

*John Novak, a Morningstar analyst, said United Rentals' latest disclosure was "another indication of confusion surrounding the company's accounting, and it's an indication of internal chaos when the CFO and the board are negotiating through the press.*

*"They can't quantify or describe what this SEC investigation is about because it's so broad," Novak added, saying the company has not been forthcoming with details on the probe, refusing to take questions on the issue during a recent analyst conference call. Morningstar is advising individual investors to avoid the company.*

UBS analyst David Bleustein, in a research note, said, "A key question on investors' minds will be why is Mr. Milne not willing to immediately respond to the committee's questions?"

\* \* \*

Shares of United Rentals were down $1.86 at $18.35 in afternoon trading on the New York Stock Exchange.

ACCOUNTING ISSUES

The company detailed a range of accounting issues that will be reflected in a restatement of past results.

United Rentals expects to restate self-insurance reserves for prior years, and said the original reserve estimates reflected weakness in internal controls. It said it has taken adequate steps to improve financial controls.

It said the reserves were too high for 2003 and 2004 and too low in 2002 and earlier periods.

The company also withdrew its previous estimates of an income tax provision for years prior to 2004. It had said in March a restatement would decrease the provision by about $25 million, but said Thursday it needs more analysis to determine the restatement, which will not affect 2004 results.

It also said its special committee determined that accounting for some short-term equipment sale-leaseback transactions was incorrect in 2000, 2001 and 2002. The company, which reported aggregate gross profit from the transactions of $34.2 million, said it has not reached a final conclusion about whether a restatement will be needed for these transactions.

### REASONS THE STATEMENTS WERE IMPROPER

66.     The statements contained herein were each materially false and misleading because the defendants failed to disclose and indicate: (i) that the Company, in an effort to generate a more favorable stock price and raise capital, manipulated its financial results through the use of restructuring charges, asset writedowns and debt refinancing; (ii) that the Company improperly delayed recognition of bad accounts receivable; (iii) that as a result of these manipulations, the

28

Company's announced financial results were in violation of GAAP; and (iv) that the Company's financial results were materially inflated at all relevant times.

## IMPROPER FINANCIAL REPORTING DURING THE RELEVANT PERIOD

67.    To artificially inflate the price of United Rentals' publicly traded securities, defendants used improper accounting practices in violation of GAAP and SEC reporting requirements to falsely inflate United Rentals' earnings during the Relevant Period.  GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

68.    Management is responsible for preparing financial statements that conform with GAAP.  As noted by the American Institute of Certified Public Accountants professional standards:

> [F]inancial statements are management's responsibility.... [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.   The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management.... Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

69.    United Rentals failed to file financial statements with the SEC that conformed to the requirements of GAAP; and defendants disseminated financial statements of United Rentals that were presumptively misleading and inaccurate.

70.    As a result of the foregoing improprieties, defendants caused United Rentals' reported financial results to violate, among other things, the following provisions of GAAP for which each defendant is necessarily responsible:

(a)     The principle that financial reporting should provide information that is useful to present and potential investors in making rational investment decisions and that information should be comprehensible to those who have a reasonable understanding of business and economic activities  (FASB Statement of Concepts No. 1, ¶34);

(b)     The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(c)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general  (FASB Statement of Concepts No. 1, ¶50);

(d)     The principle that financial reporting should be reliable in that it represents what it purports to represent.  The notion that information should be reliable as well as relevant is central to accounting  (FASB Statement of Concepts No. 2, ¶¶58-59);

(e)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79);

(f)     The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions  (FASB Statement of Concepts No. 2, ¶80);

(g)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent  (FASB Statement of Concepts No. 2, ¶¶95, 97); and

(h)     The principle of materiality, which provides that the omission or misstatement of an item in a financial report is material if, in light of the surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item (FASB Statement of Concepts No. 2, ¶132).

71.     Further, the undisclosed adverse financial information concealed by defendants during the Relevant Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

72.     As a result of the Individual Defendants' actions, United Rentals' market capitalization has been damaged by over $692 million.  At the same time that the defendants were causing United Rentals to suffer such devastation of its market capitalization, the Insider Selling Defendant fared much better by selling $178,860.00 of his personally held stock.

### ILLEGAL INSIDER SELLING

73.     While in possession of the undisclosed material adverse information, the Insider Selling Defendant sold the following shares of United Rentals stock:

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Christian M. Weyer | 5/5/2004 | 2000 | $17.90 | $35,800.00 |
| | 5/4/2004 | 2000 | $17.44 | $34,880.00 |
| | 5/3/2004 | 2000 | $17.74 | $35,480.00 |
| | 4/30/2004 | 2000 | $17.40 | $34,800.00 |
| | 4/26/2004 | 2000 | $18.95 | $37,900.00 |
| | | **10000** | | **$178,860.00** |
| **Total:** | | **10000** | | **$178,860.00** |

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

74.     Plaintiff brings this action derivatively in the right and for the benefit of United Rentals to redress injuries suffered, and to be suffered, by United Rentals as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  United

Rentals is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

75.     Plaintiff will adequately and fairly represent the interests of United Rentals in enforcing and prosecuting its rights.

76.     Plaintiff is and was an owner of the stock of United Rentals during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

77.     The current Board of Directors of United Rentals consists of the following twelve individuals: defendants Hicks, Jacobs, Milne, Clark, Gross, McAllister, McAuley, McKinney, Suwyn and Tsai and non-defendants Leon D. Black ("Black") and Jason Papastavrou ("Papastravrou").  Plaintiff has not made any demand on the present Board of United Rentals to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

(a)     The Compensation Committee of the Board, by its charter, determines, reviews and approves corporate goals and objectives relevant to the compensation of the CEO and, to the extent it deems appropriate, other executive officers; determines and approves the compensation of the CEO; reviews and approves the compensation of the Company's other executive officers; reviews and approves any incentive-compensation plan or equity-based plan for the benefit of executive officers; administers any incentive-compensation plan or equity-based plan for the benefit of executive officers; and makes recommendations to the Board with respect to the compensation of the Company's non-management directors.  The Compensation Committee is comprised of defendants Gross, Clark and McAuley.  As the members of the Compensation Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against defendants Gross, Clark and McAuley.  To do so would jeopardize each defendant's personal financial compensation.  Thus, demand on defendants McAllister, McKinney, Jacobs, Hicks, Milne, Suwyn and Tsai is futile;

(b)     The principal professional occupation of defendant Hicks is his employment with United Rentals, pursuant to which he received and continues to receive substantial monetary

compensations and other benefits.  Specifically, for FY:03, United Rentals paid defendant Hicks $800,900, in salary, bonus and other compensation.  Accordingly, defendant Hicks lacks independence from defendants Gross, Clark and McAuley, defendants who are not disinterested and/or independent and who exert influence over defendant Hicks' compensation by virtue of their positions as members of the Compensation Committee.  This lack of independence renders defendant Hicks incapable of impartially considering a demand to commence and vigorously prosecute this action;

(c)    The principal professional occupation of defendant Milne is his employment with United Rentals, pursuant to which he received and continues to receive substantial monetary compensations and other benefits.  Specifically, for FY:03, United Rentals paid defendant Milne $770,900, in salary, bonus and other compensation.  Accordingly, defendant Milne lacks independence from defendants Gross, Clark and McAuley, defendants who are not disinterested and/or independent and who exert influence over defendant Milne's compensation by virtue of their positions as members of the Compensation Committee.  This lack of independence renders defendant Milne incapable of impartially considering a demand to commence and vigorously prosecute this action;

(d)    According to United Rentals' Proxy Statement filed with the SEC on or about April 21, 2004 and the Company's public website, defendants Gross, Tsai, Suwyn and McAuley were, during the Relevant Period, members of the Audit Committee.  The Audit Committee is responsible, by its charter, for reviewing and discussing with management the Company's annual audited financial statements, including disclosures made in management's discussion and analysis, and recommending to the Board whether the audited financial statements should be included in the Company's Form 10-K; reviewing and discussing with management and the independent auditor the Company's quarterly financial statements prior to the filing of its Form 10-Q, including the results of the independent auditor's review of the quarterly financial statements and disclosures made in management's discussion and analysis; discussing the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies; discussing with management and the independent auditor significant financial reporting issues and judgments

33

made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles, any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies; periodically reviewing with management its evaluation of the Company's internal control structure and procedures for financial reporting, and periodically reviewing management's conclusions about the efficacy of such internal controls and procedures, including any significant deficiencies in, or material non-compliance with, such controls and procedures; and reviewing the significant reports to management prepared by the internal auditing department and management's responses.  Nonetheless, the Audit Committee recommended that the Board include the improper audited consolidated financial statements in United Rentals' Annual Report on Form 10-K for the year ended December 31, 2003, as filed with the SEC, as well as the other improper press releases and SEC filings described herein.  By such actions, defendants Gross, Tsai, Suwyn and McAuley breached their duties by causing or allowing the improper financials described above.  As a result of these defendants' breach of their duties, any demand upon them is futile;

(e)     Defendant Clark, by his specialized financial expertise, was in a unique position to understand the business of United Rentals, as well as its finances, markets and present and future business prospects.  Specifically, defendant Clark is Vice Chairman and a director of Lehman Brothers Inc. and has been since 1993. From 1990 until assuming his current position, defendant Clark was Chairman, President and CEO of Shearson Lehman Brothers Holdings Inc. Defendant Clark was previously a senior executive at American Express Company from 1981 to 1993, and a managing director of Blyth Eastman Paine Webber Incorporated or predecessor firms from 1968 to 1981.  While at American Express, defendant Clark's positions included five years as Executive Vice President and CFO.  This defendant, because of his unique qualifications, had a heightened duty to insure the accuracy and fairness of United Rentals' financials.  Nonetheless, defendant Clark breached his duties by causing or allowing the improper financials described herein. As a result of this defendant's breach of his duties, any demand upon him is futile;

(f)     Defendant McAuley, by his specialized financial expertise, was in a unique position to understand the business of United Rentals, as well as its finances, markets and present and future business prospects.  Specifically, defendant McAuley has been a partner at NH II, LLC, a consulting firm that specializes in telecommunications businesses, since 2003. Defendant McAuley is a co-founder of Nextel Communications, Inc. and held senior executive positions at Nextel from the company's inception in 1987 until 1996, including seven years as President and CEO.  Upon leaving Nextel, he joined Imagine Tile, a custom tile manufacturer, where he served as chairman and CEO from 1996 to 1999 and continues to serve as chairman.  He also served as president and CEO of NeoWorld Communications, Inc., a wireless telecommunications company, from 1999 until the sale of that company to Nextel in 2003.  Defendant McAuley is a certified public accountant and, prior to co-founding Nextel, his positions included corporate controller at Norton Simon Inc. and manager at Deloitte & Touche, an accounting firm.  This defendant, because of his unique qualifications, had a heightened duty to insure the accuracy and fairness of United Rentals' financials.  Nonetheless, defendant McAuley breached his duties by causing or allowing the improper financials described herein.  As a result of this defendant's breach of his duties, any demand upon him is futile;

(g)     Defendant McKinney, by his specialized financial expertise, was in a unique position to understand the business of United Rentals, as well as its finances, markets and present and future business prospects.  Specifically, defendant McKinney previously served as CFO of U.S. Rentals, from 1990 until September 1998, and as controller of U.S. Rentals, from 1988 until 1990. Prior to joining U.S. Rentals, defendant McKinney held various positions at Iomega Corporation, including assistant controller, and at the accounting firm of Arthur Andersen & Co.  This defendant, because of his unique qualifications, had a heightened duty to insure the accuracy and fairness of United Rentals' financials.  Nonetheless, defendant McKinney breached his duties by causing or allowing the improper financials described herein.  As a result of this defendant's breach of his duties, any demand upon him is futile;

(h)     On March 14, 2005, United Rentals filed a Form 8-K with the SEC.  The Form 8-K stated:

35

In January 2005, an alleged stockholder of the company filed an action in Connecticut State Superior Court, Judicial District of Norwalk/Stamford at Stamford, purportedly suing derivatively on behalf of the company. The action names as defendants each of our directors and our vice president and corporate controller. In addition, the action names the company as a nominal defendant. The complaint alleges, among other things, that the individual defendants breached their fiduciary duties to the company by causing or allowing the company to disseminate misleading and inaccurate information to shareholders and the market and by failing to establish and maintain adequate accounting controls, thus exposing the company to damages. The complaint seeks unspecified compensatory damages, costs and expenses against the individual defendants.

In November 2004, the company also received a letter from counsel for a purported shareholder, raising allegations similar to the ones set forth in the derivative complaint described above and demanding that the company take action in response to those allegations against certain of its current and/or former directors and officers. Following receipt of the letter, *the board of directors formed a special committee of the board to consider the letter*.

The fact that the Board chose to form a special committee to investigate allegations similar to those alleged in the instant complaint is an admission that a majority of the Board lacked the independence to adequately consider a demand. Else, the entire board would have considered the demand letter referred to in the March 14 Form 8-K. Accordingly, demand is futile;

(i)     According to United Rentals' Proxy Statement filed with the SEC on or about April 21, 2004, non-employee directors on the Board receive annual retainer fees of $40,000 for serving as director, $10,000 for serving as chairman of the audit committee and $5,000 for serving as chairman of any other committee. Non-employee directors also receive meeting attendance fees of $1,500 for each Board meeting, $2,000 for each audit committee meeting and $1,500 for each other committee meeting; and an annual grant of options to purchase 3,000 shares of United Rentals' common stock at an exercise price equal to the market value of the stock at the time of grant. Accordingly, defendants Jacobs, Clark, Gross, McAllister, McAuley, McKinney, Suwyn and Tsai, as well as Black and Papastravou, are incapable of impartially considering a demand to commence and vigorously prosecute this action because they have an interest in safeguarding their substantial compensation;

(j)     The entire United Rentals Board of Directors and senior management participated in the wrongs complained of herein. United Rentals' directors are not disinterested or independent due to the following: defendants Hicks, Jacobs, Milne, Clark, Gross, McAllister, McAuley, McKinney, Suwyn and Tsai served on the United Rentals Board during the Relevant

36

Period.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs.  Each of the above referenced defendants breached the fiduciary duties that they owed to United Rentals and its shareholders in that they failed to prevent and correct the improper financials.  Thus, the United Rentals Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected United Rentals to millions of dollars in liability for possible violations of applicable securities laws;

(k)   The Individual Defendants, because of their inter related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein.  In addition to the conflicts that exist as a result of their participation in the improper accounting and insider selling, as detailed herein supra, the majority of the Board, including the defendants listed below, are subject to the following prejudicial entanglements:

(i)   ***Hicks and Jacobs Are Long Time Business Associates***:

Defendant Hicks served as the Vice Chairman of the Board and Chief Acquisition Officer of United Waste Systems, Inc. ("United Waste Systems") between 1993 and 1997.  Defendant Jacobs was the Chairman of the Board and CEO of United Waste Systems between 1989 and 1997.  Because of their long standing and entangling business and professional relationships, neither defendant Hicks nor defendant Jacobs will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants.

(ii)   ***Hicks and McAuley Are Long Time Business Associates***:

Defendant Hicks served as the Vice Chairman of the Board and CEO of Nextel Communications, Inc. ("Nextel") between 1994 and 1995.  Defendant McAuley is the Co-founder and held several senior executive positions with Nextel between 1987 and 1996.  Because of their long standing and entangling business and professional relationships, neither defendant Hicks nor defendant McAuley will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants.

(iii)   ***Hicks and Clark Are Long Time Business Associates***:

Defendant Hicks is a director of Maytag Corporation ("Maytag"), and has been since 1994.  Defendant Clark is a director of Maytag, and has been since 1986.  Because of their long standing and entangling business and professional relationships, neither defendant Hicks nor defendant Clark will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants.

(iv)    ***Black, Gross and Tsai Are Long Time Business Associates***:

Black is a founding principal of Apollo Advisors L.P. ("Apollo"), and has been since 1990. Defendant Gross is a founding principal of Apollo, and has been since 1990. Defendant Tsai is a director and investor of Apollo, and has been since at least 2004. Because of their long standing and entangling business and professional relationships, Black will not take the action requested by plaintiff against defendants Gross and Tsai or the remainder of the Individual Defendants.

(v)    ***Black and Tsai Are Long Time Business Associates***:

Black served as a director of Sequa Corporation ("Sequa") between 1997 and 2003. Defendant Tsai is a director of Sequa, and has been since 1973. Because of their long standing and entangling business and professional relationships, Black will not take the action requested by plaintiff herein against defendant Tsai or the remainder of the Individual Defendants.

(vi)    ***Black and Gross Are Long Time Business Associates***:

Black is a director of Allied Waste Industries, Inc. ("Allied"), and has since 2000. Defendant Gross is a director of Allied, and has been since 1997. Black serves as a trustee of Mount Sinai Hospital, and has since at least 2004. Defendant Gross is the Co-Chair of the Board of Directors of Mount Sinai Children's Center Foundation, and has since at least 2004. Because of their long standing and entangling business and professional relationships, Black will not take the action requested by plaintiff herein against defendant Gross or the remainder of the Individual Defendants.

(vii)    ***Gross and Tsai Are Long Time Business Associates***:

Defendant Gross is a director of Saks Incorporated ("Saks"), and has been since 1994. Defendant Tsai served as a director of Saks between 1993 and 2001, and currently serves as a director emeritus of Saks. Because of their long standing and entangling business and professional relationships, neither defendant Gross nor defendant Tsai will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants.

(viii)    ***Jacobs Maintains Conflicting Financial Motivations***:

Defendant Jacobs is the Chairman of the Board of United Rentals, and has been since 1997. Defendant Jacobs also serves as a consultant to United Rentals, and has since December 2003. Under his consulting agreement with United Rentals, defendant Jacobs receives an annual fee of $250,000, health and insurance benefits, $2,084 per month in lieu of benefits other than health insurance and personal use of the Company's aircraft. Because of Jacobs' entangling business and financial relationships with United Rentals, defendant Jacobs will not take the action requested by plaintiff herein against the remainder of the Individual Defendants.

(l)    Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein;

(m)    As of April 21, 2004, defendants Jacobs, Hicks, Milne, Gross, McKinney and Tsai owned thousands of United Rentals shares. Specifically, defendant Jacobs owned 5,673,955 shares; defendant Hicks owned 1,115,885 shares; defendant Milne owned 2,297,856 shares;

38

defendant Gross owned 35,644 shares; defendant McKinney owned 681,951 shares; and defendant Tsai owned 6,786 shares. Thus, these defendants had every incentive to participate in the improper accounting in order to effectuate a commensurate rise in United Rentals' stock price;

(n)     The defendant directors of United Rentals, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from United Rentals' stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

(o)     In order to bring this suit, all of the directors of United Rentals would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(p)     The acts complained of constitute violations of the fiduciary duties owed by United Rentals' officers and directors and these acts are incapable of ratification;

(q)     Each of the defendant directors of United Rentals authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

(r)     Any suit by the current directors of United Rentals to remedy these wrongs would likely expose the Individual Defendants and United Rentals to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(s)     United Rentals has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct

to attempt to recover for United Rentals any part of the damages United Rentals suffered and will suffer thereby;

       (t)    If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand is futile; and

       (u)    If United Rentals' current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of United Rentals. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by United Rentals against these defendants, known as, inter alia, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of United Rentals, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause United Rentals to sue them, since they will face a large uninsured liability.

    78.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board of Directors has failed and refused to seek to recover for United Rentals for any of the wrongdoing alleged by plaintiff herein.

79.     Plaintiff has not made any demand on shareholders of United Rentals to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     United Rentals is a publicly held company with approximately 77 million shares outstanding, and thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against Defendant Christian M. Weyer for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

80.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

81.     At the time of the stock sales set forth herein, defendant Weyer knew the information described above, and sold United Rentals common stock on the basis of such information.

82.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.   It was a proprietary asset belonging to the Company, which the Insider Selling Defendant used for his own benefit when he sold United Rentals common stock.

83.     At the time of their stock sales, the Insider Selling Defendant knew that the Company's revenues were materially overstated.  The Insider Selling Defendant's sales of United Rentals common stock while in possession and control of this material adverse non-public information was a breach of his fiduciary duties of loyalty and good faith.

84.     Since the use of the Company's proprietary information for his own gain constitutes a breach of the Insider Selling Defendant's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendant obtained thereby.

41

## COUNT II

### Against All Defendants for Breach of Fiduciary Duty

85.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

86.    The Individual Defendants owed and owe United Rentals fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe United Rentals the highest obligation of good faith, fair dealing, loyalty and due care.

87.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

88.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

89.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, United Rentals has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

90.    Plaintiff on behalf of United Rentals has no adequate remedy at law.

## COUNT III

### Against All Defendants for Abuse of Control

91.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

92.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence United Rentals, for which they are legally responsible.

93.    As a direct and proximate result of the Individual Defendants' abuse of control, United Rentals has sustained significant damages.

94.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

95.     Plaintiff on behalf of United Rentals has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Gross Mismanagement

96.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

97.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of United Rentals in a manner consistent with the operations of a publicly held corporation.

98.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, United Rentals has sustained significant damages in excess of hundreds of millions of dollars.

99.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

100.    Plaintiff on behalf of United Rentals has no adequate remedy at law.

## COUNT V

### Against All Defendants for Waste of Corporate Assets

101.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

102.    As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused United Rentals to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions/billions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

103.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

104.    Plaintiff on behalf of United Rentals has no adequate remedy at law.

## COUNT VI

### Against All Defendants for Unjust Enrichment

105.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

106.   By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of United Rentals.

107.   Plaintiff, as a shareholder and representative of United Rentals, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT VII

### Against Defendants Hicks, Jacobs and Milne for Disgorgement
### Under the Sarbanes-Oxley Act

108.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

109.   Pursuant to Sarbanes-Oxley Act of 2002 § 304, because United Rentals will restate its financial statements for fiscal years 1999 through 2004 due to material noncompliance with SEC rules and published guidance as a result of false and misleading financial statements, defendant Hicks, as United Rentals' CEO, from December 2003 to the present, defendant Jacobs as United Rentals' CEO, from September 1997 to December 2003, and defendant Milne as United Rentals' CFO, since December 2002, are required to reimburse United Rentals for all bonuses or other incentive-based or equity-based compensation, received by them from United Rentals during the fiscal years 1999 through 2004.

110.   Defendants Hicks, Jacobs and Milne are also liable to plaintiff for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of United Rentals.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.      Declaring that defendants Hicks, Jacobs and Milne are liable under the Sarbanes-Oxley Act of 2002 and requiring them to reimburse United Rentals for all bonuses or other incentive-based or equity-based compensation received by them during 1999 through 2004;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of United Rentals has an effective remedy;

D.      Awarding to United Rentals restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  August 1, 2005             DRUBNER, HARTLEY & O'CONNOR
                                   GARY B. O'CONNOR
                                   BRIAN CLIFFORD



                                   _____
                                            GARY B. O'CONNOR
                                   Bar No. ct 11216
                                   Brian C. Clifford
                                   Bar No. ct 25442
                                   500 Chase Parkway
                                   Waterbury, CT 06708
                                   Telephone: 203/753-8966
                                   Facsimile: 203/753-6373

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
610 West Ash, Suite 1800
San Diego, CA  92101
Telephone: 619/525-3990
Facsimile:  619/525-3991


FARUQI & FARUQI, LLP
NADEEM FARUQI
320 East 39th Street
New York, NY 10016
Telephone: 212/983-9330
Facsimile:  212/983-9331

Counsel for Plaintiff

<u>VERIFICATION</u>

I, BRIAN J. ROBBINS, hereby declare as follows:

1)      I am a partner of the law firm of Robbins Umeda & Fink, LLP, one of the counsel for plaintiff in the above-entitled action.  I have read the foregoing complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2)      I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this 29th day of July, 2005, at San Diego, California.

                                              _____
                                                    BRIAN J. ROBBINS