1999. The Form 10-Q was signed by defendants Nolan and McKinney, and contained the following statement: "Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized."

57.     On August 16, 1999, one or more of the Individual Defendants caused or allowed United Rentals to file with the SEC its Form 10-Q report for the quarterly period ended June 30, 1999. The Form 10-Q was signed by defendants Nolan and non-defendant Peter R. Borzilleri ("Borzilleri"), Vice President and Corporate Controller (Chief Accounting Officer), and contained the following statement: "Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized."

58.     On November 15, 1999, one or the Individual Defendants caused or allowed United Rentals to file with the SEC its Form 10-Q report for the quarterly period ended September 30, 1999. The Form 10-Q was signed by defendant Nolan and non-defendant Borzilleri, and contained the following statement: "Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized."

59.     On March 30, 2000, one or more of the Individual Defendants caused or allowed United Rentals to file with the SEC its Form 10-K report for the annual period ended December 31, 1999. The Form 10-K was signed by defendant Nolan and contained the following statement: "Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized." The form also was signed by defendants Jacobs, Hicks, Milne, McKinney, DeFeo, Gross, Tsai and Weyer, and non-defendants Berry, Heckmann and Borzilleri, such signatures being immediately preceded by the following statement: "Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant …."

60.     On May 15, 2000, one or more of the Individual Defendants caused or allowed United Rentals to file with the SEC its Form 10-Q report for the quarterly period ended March 31,

2000. The Form 10-Q was signed by defendant Nolan and non-defendant Borzilleri, and contained the following statement: "Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized."

61.     On August 11, 2000, one or more of the Individual Defendants caused or allowed United Rentals to file with the SEC its Form 10-Q report for the quarterly period ended June 30, 2000. The Form 10-Q was signed by defendant Nolan and non-defendant Borzilleri, and contained the following statement: "Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized."

62.     On November 14, 2000, one or more of the Individual Defendants caused or allowed United Rentals to file with the SEC its Form 10-Q report for the quarterly period ended September 30, 2000. The Form 10-Q was signed by defendant Nolan and non-defendant Borzilleri, and contained the following statement: "Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized."

63.     On March 22, 2001, one or more of the Individual Defendants caused or allowed United Rentals to file with the SEC its Form 10-K report for the annual period ended December 31, 2000. The Form 10-K was signed by defendant Nolan and contained the following statement: "Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized."  The form also was signed by defendants Jacobs, Hicks, Milne, McKinney, Black, DeFeo, Gross, Tsai, Weyer and Nolan, and non-defendants Heckmann, Berry, Colburn and Borzilleri, such signatures being immediately preceded by the following statement: "Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant ...." On October 9, 2001, one or more of the Individual Defendants caused or allowed the Company to file an amended Form 10-K for the annual period ended December 31, 2000. The amended report was signed by defendant Nolan and contained the

following statement: "Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this amended report to be signed on its behalf by the undersigned, thereunto duly authorized."

64.     On May 15, 2001, one or more of the Individual Defendants caused or allowed United Rentals to file with the SEC its Form 10-Q report for the quarterly period ended March 31, 2001. The Form 10-Q was signed by defendant Nolan and contained the following statement: "Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized."

65.     On August 14, 2001, one or more of the Individual Defendants caused or allowed United Rentals to file with the SEC its Form 10-Q report for the quarterly period ended June 30, 2001. The Company filed an amended Form 10-Q for that period on October 9, 2001. Both Forms 10-Q were signed by defendant Nolan and contained the following statement: "Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized."

66.     On November 14, 2001, one or more of the Individual Defendants caused or allowed United Rentals to file with the SEC its Form 10-Q report for the quarterly period ended September 30, 2001. The Form 10-Q was signed by defendant Nolan and contained the following statement: "Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized."

67.     On March 29, 2002, one or more of the Individual Defendants caused or allowed United Rentals to file with the SEC its Form 10-K report for the annual period ended December 31, 2001. The Form 10-K was signed by defendant Nolan and contained the following statement: "Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized." The form also was signed by defendants Jacobs, Hicks, Milne, McKinney, Black, DeFeo, Gross, Weyer, Nolan and Sherk, and non-defendants Colburn, Heckmann, David C. Katz ("Katz") and Timothy J. Tully ("Tully"), such signatures being immediately preceded by the

following statement: "Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant ...."

68. On May 15, 2002, one or more of the Individual Defendants caused or allowed United Rentals to file with the SEC its Form 10-Q report for the quarterly period ended March 31, 2002. The Form 10-Q was signed by defendants Nolan and Sherk and contained the following statement: "Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized."

69. On August 14, 2002, one or more of the Individual Defendants caused or allowed United Rentals to file with the SEC its Form 10-Q report for the quarterly period ended June 30, 2002. The Form 10-Q was signed by defendants Nolan and Sherk and contained the following statement: "Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized."

70. On November 14, 2002, one or more of the Individual Defendants caused or allowed United Rentals to file with the SEC its Form 10-Q report for the quarterly period ended September 30, 2002. The Form 10-Q was signed by defendants Nolan and Sherk and contained the following statement: "Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized."

71. On March 28, 2003, one or more of the Individual Defendants caused or allowed United Rentals to file with the SEC its Form 10-K report for the annual period ended December 31, 2002. The Form 10-K was signed by defendant Milne and contained the following statement: "Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized." The form also was signed by defendants Jacobs, Hicks, Milne, Black, DeFeo, Gross, McKinney, Tsai, Weyer and Sherk, and non-defendant Katz, such signatures being immediately preceded by the following statement: "Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant ...."

72. The Company's Form 10-K for the annual period ended December 31, 2002, contained the following certification by defendants Milne and Jacobs (the certification below by Milne is identical to the certification by Jacobs):

I, John N. Milne, certify that:

1. I have reviewed this annual report on Form 10-K of United Rentals, Inc. and United Rentals (North America), Inc.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this annual report;

4. The registrants' other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrants and have:

    a) designed such disclosure controls and procedures to ensure that material information relating to the registrants, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    b) evaluated the effectiveness of the registrants' disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

    c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrants' other certifying officers and I have disclosed, based on our most recent evaluation, to the registrants' auditors and the audit committee of registrants' boards of directors (or persons performing the equivalent function):

    a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrants' ability to record, process, summarize and report financial data and have identified for the registrants' auditors any material weaknesses in internal controls; and

    b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrants' internal controls; and

    6.      The registrants' other certifying officers and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

    73.      On April 30, 2003, one or more of the Individual Defendants caused or allowed the Company to file its annual proxy statement with the SEC. Defendants Gross, Tsai and Weyer, as members of the Audit Committee, authorized the following statement in the proxy statement:

> In connection with the audited financial statements contained in the Company's 2002 Annual Report on Form 10-K, the Audit Committee:
>
> - reviewed and discussed the audited financial statements with the Company's management;
>
> - discussed with Ernst & Young LLP, the Company's independent auditors, the matters required to be discussed by Statement of Auditing Standards ("SAS") 61, Communication with Audit Committees, as amended by SAS 90;
>
> - reviewed the written disclosures and the letter from Ernst & Young LLP required by Independence Standard Board Standard No. 1, Independence Discussions with Audit Committees, and discussed with the auditors their independence; and
>
> - based on the foregoing review and discussions, recommended to the board of directors that the audited financial statements be included in the Company's 2002 Annual Report on Form 10-K.

Further, defendants Tsai and Weyer, as members of the Compensation Committee, authorized that committee to issue a report on executive compensation. The report asserted, *inter alia*, that "[t]he Company in 2002 was solidly profitable (excluding non-cash goodwill write-offs)," which was among the factors cited by the report that the Compensation Committee considered when setting executive compensation levels for fiscal year 2002.

    74.      On October 23, 2003, one or more of the Individual Defendants caused or allowed the Company to issue a press release entitled "United Rentals Announces Third Quarter Results." The press release stated in part:

> The company reported revenues of $805.1 million, compared to $783.1 million for the third quarter of 2002. Rental revenues were 78% of total revenues, sales of rental equipment were 5%, and sales of equipment and merchandise and other revenues were 17%. Same-store rental revenues increased 4.7% year-over-year, and rental rates rose 3.4% year-over-year. Equipment utilization was 65.1% in this year's third quarter compared to 64.1% in the same period last year, and sharing

of equipment among branches accounted for 12.9% of rental revenues compared to 11.8% in last year's third quarter.

Net income for the quarter was $31.9 million and earnings per diluted share was $0.34. This includes a non-cash charge of $11.7 million ($10.2 million after-tax or $0.10 per diluted share) attributable to the vesting of restricted shares granted to senior executives in 2001. Vesting was triggered this quarter by the increase in the company's stock price. Excluding this charge, net income for the quarter would have been $42.0 million and earnings per diluted share $0.44, compared with net income of $40.8 million and earnings per diluted share of $0.43 for the same period last year.

Bradley Jacobs, chairman and chief executive officer, said, "This quarter's increase in rental rates was achieved despite continued softness in our end markets. We expect that the emerging economic recovery should lead to improved business conditions, but the timing of a significant rebound in non-residential construction remains difficult to forecast."

Wayland Hicks, chief operating officer, added, "We have been making concerted efforts to improve our rates by focusing on effective pricing practices. While there remains a lot more we can do, we are pleased with this quarter's increase and the related improvements in utilization and same-store rental revenues."

For the nine-month period ended September 30, 2003, revenues were $2.13 billion, compared to $2.13 billion for the first nine months of 2002. Net income was $46.6 million and earnings per diluted share was $0.50 for the nine-month period ended September 30, 2003, compared with net income as adjusted of $99.5 million and earnings per diluted share as adjusted of $1.07 for the same period last year. The results for 2002 have been adjusted to exclude the effect of a change in accounting principle relating to goodwill that resulted in a non-cash charge, net of tax, of $288.3 million.

75.     On October 28, 2003, one or more of the Individual Defendants caused or allowed the Company to issue a press release entitled "United Rentals Prices Convertible Senior Subordinated Notes Offering and Announces Planned Offering of Senior Subordinated Notes." The press release stated in part:

United Rentals, Inc. announced today that it priced an offering of $125 million aggregate principal amount of 1 7/8% Convertible Senior Subordinated Notes due 2023. The company has granted the initial purchasers of the notes a 30-day option to purchase up to an additional $18.75 million aggregate principal amount of notes.

The notes will be convertible, under certain circumstances, into the company's common stock at an initial conversion rate of 38.952 shares per $1,000 principal amount of notes. This is equivalent to a conversion price of approximately $25.67 per share. Holders of the notes will have the ability to require the company to repurchase the notes in cash, in whole or in part, in October 2010 and specified times thereafter. The repurchase price will be 100% of the principal amount of the notes plus accrued and unpaid interest.

The company plans to use the net proceeds of the convertible notes offering to buy out existing equipment leases and/or for general corporate purposes.

> The company also announced that it expects to proceed with an additional offering of approximately $450 million aggregate principal amount of non-convertible senior subordinated notes. The company expects to use the net proceeds from this offering to redeem $205 million face amount of outstanding 8.80% Senior Subordinated Notes due 2008 and $200 million face amount of outstanding 9 ½% Senior Subordinated Notes due 2008, and for general corporate purposes. Completion of this additional offering will be conditioned on the company obtaining an amendment to its senior credit facility allowing the planned redemption of outstanding notes.

76.     On October 29, 2003, the Company issued a press release entitled "United Rentals Senior Subordinated Notes Offering." The press release stated in part:

> The size of the offering was increased to $525 million from the previously announced $450 million. The notes will bear interest at 7.75% and be due in 2013.
>
> The company expects to use approximately $424 million of the offering net proceeds to redeem $205 million face amount of outstanding 8.80% Senior Subordinated Notes due 2008 and $200 million face amount of outstanding 9 ½% Senior Subordinated Notes due 2008. The balance will be used to buy out existing equipment leases and/or for general corporate purposes. Completion of this offering is conditioned on the company obtaining an amendment to its senior credit facility allowing the planned redemption of outstanding notes.

77.     On November 14, 2003, one or more of the Individual Defendants caused or allowed United Rentals to file Form 10-Q for the quarterly period ended September 30, 2003 with the SEC. The Company's Form 10-Q was signed by defendants Milne and Sherk and reaffirmed the Company's previously-announced financial results. Moreover, the Company represented the following:

> The Consolidated Financial Statements of the Company included herein are unaudited and, in the opinion of management, such financial statements reflect all adjustments, consisting only of normal recurring adjustments, necessary to present fairly the results of the interim periods presented. Interim financial statements do not require all disclosures normally presented in year-end financial statements, and, accordingly, certain disclosures have been omitted.

78.     Additionally, the Company's Form 10-Q for the quarterly period ended September 30, 2003, included the following certifications signed by each of defendants Jacobs and Milne:

> 2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report.


79. On January 16, 2004, one or more of the Individual Defendants caused or allowed the Company to issue a press release entitled "United Rentals Announces Refinancing and Related Cash Tender Offer and Consent Solicitation for Outstanding 10¾% Senior Notes Due 2008." The press release stated in part:

> United Rentals, Inc. announced today that it intends to refinance a substantial portion of its outstanding indebtedness over the next several weeks. The refinancing was being undertaken to take advantage of current market opportunities that should allow the Company to reduce its interest expense and extend the maturities of a substantial portion of its debt.
>
> As part of the refinancing, the company expects to replace its existing senior secured credit facility with a new secured credit facility and refinance outstanding senior and subordinated notes. The refinancing will be funded primarily through the issuance of new senior and subordinated notes and funds available under the new secured credit facility. The debt expected to be refinanced includes: (i) $640 million of term loans, (ii) all borrowings under the company's revolving credit facility, (iii) $860 million principal amount of 10 3/4% Senior Notes due 2008, (iv) $300 million principal amount of 9 1/4% Senior Subordinated Notes due 2009 and (v) $250 million principal amount of 9% Senior Subordinated Notes due 2009.
>
> The company also announced that, as part of the refinancing, it has commenced a cash tender offer and consent solicitation for all of its outstanding 10 3/4% Senior Notes due 2008 ("10 3/4% Notes"). These notes are comprised of (i) $650 million principal amount of 10 3/4% Notes issued under an indenture dated April 20, 2001 (CUSIP No. 911365AB0) and (ii) $210 million principal amount of 10 3/4% Notes issued under an indenture dated December 24, 2002 (CUSIP No. 911365AE4).

80. On January 22, 2004, one or more of the Individual Defendants caused or allowed the Company to issue a press release entitled "United Rentals Announces Note Offerings." The press release stated in part:

> United Rentals, Inc. announced today that it will offer for sale $1 billion of senior notes and $375 million of senior subordinated notes. These offerings are part of the company's previously announced plan to refinance a substantial portion of its outstanding indebtedness in order to lower interest expense and extend maturities.
>
> The company also confirmed that it is proceeding with its previously announced plan to replace its existing senior secured credit facility with a new senior secured credit facility. The new facility is expected to include: (i) a $750 million term loan, (ii) a $650 million revolving credit facility that may be used for loans and/or letters of credit (up to a maximum of $250 million for letters of credit) and (iii) a $150 million institutional letter of credit facility that will provide additional letter of credit capacity.
>
> The company expects to use the proceeds from the note offerings, together with funds expected to be available under the new credit facility, to: (i) redeem $300 million principal amount of outstanding 9 1/4% Senior Subordinated Notes due 2009, (ii) repay $639 million of term loans and approximately $52 million of other

borrowings outstanding under the company's existing credit facility, (iii) repurchase up to $860 million principal amount of outstanding 10 3/4% Senior Notes due 2008 pursuant to the company's previously announced tender offer for such notes, (iv) redeem $250 million principal amount of outstanding 9% Senior Subordinated Notes due 2009 and (v) pay related redemption and repurchase premiums and transaction costs.

The closing of the senior notes offering, but not the senior subordinated notes offering, will be conditioned on: (i) the company obtaining the new credit facility and (ii) at least $516 million aggregate principal amount of outstanding 10 3/4% Senior Notes due 2008 being tendered to the company pursuant to the company's previously announced tender offer.

81. On February 17, 2004, United Rentals announced that it had completed its offerings of $1 billion of 6 1/2% Senior Notes Due 2012 and $375 million of 7% Senior Subordinated Notes Due 2014. The Company also announced that it obtained a new senior secured credit facility. The Company was using the proceeds from the note offerings, together with borrowings available under the new credit facility, to complete the refinancing of $2.1 billion of its debt in accordance with its previously announced plan. The refinancing would reduce the Company's interest expense and extend the maturities of a substantial portion of the company's debt. More specifically, the Company stated:

As part of the refinancing, the company (i) repaid $639 million of term loans and $52 million of borrowings that were outstanding under the company's old credit facility, (ii) repurchased $845 million principal amount of its 10 3/4% Senior Notes due 2008 (which represented more than 98% of the total outstanding) pursuant to its previously announced tender offer, (iii) called for redemption $300 million principal amount of its outstanding 9 1/4% Senior Subordinated Notes due 2009 and (iv) will call for redemption $250 million principal amount of its outstanding 9% Senior Subordinated Notes due 2009. The redemption of the 9 ¼% Senior Subordinated Notes is expected to be completed on February 27, 2004, and the redemption of the 9% Senior Subordinated Notes is expected to be completed on April 1, 2004.

The company's new senior secured credit facility replaces the facility the company previously had in place. The new facility includes (i) a $750 million term loan, (ii) a $650 million revolving credit facility that may be used for loans and/or letters of credit (up to a maximum of $250 million for letters of credit) and (iii) a $150 million institutional letter of credit facility that provides additional letter of credit capacity. The term loan will be obtained in two draws. An initial draw of $550 million was obtained upon the closing of the credit facility, and an additional $200 million is expected to be obtained on April 1, 2004.

82. On February 25, 2004, one or more of the Individual Defendants caused or allowed the Company to issue a press release entitled "United Rentals Reports Results for Fourth Quarter and Full Year 2003." The press release stated in part:

For the full year 2003, the company reported revenues of $2.87 billion, an increase of 1.6% compared with $2.82 billion for 2002. Same-store rental revenues for the full year increased 3.7% from the prior year and rental rates increased 2.1%. Revenues generated by sharing equipment between branches improved to 11.5% of rental revenues compared with 11.3% in 2002. Equipment utilization for the full year 2003 was essentially flat with the prior year at 57.1% compared with 57.0% in 2002.

Adjusted net income for the full year was $71.8 million and adjusted diluted earnings per share was $0.75 compared with adjusted net income of $107.6 million and adjusted diluted earnings per share of $1.11 in 2002. The adjusted net income and diluted earnings per share exclude the charges described below as well as the increase to diluted earnings per share from the company's repurchases of its preferred securities.

Wayland Hicks, vice chairman and chief executive officer, said, "Our intense focus on rental rates began to show real results in 2003. We saw our first annual rate improvement since 2000, and our 5.6% rate increase in the fourth quarter was the highest quarterly increase in the history of our company. Furthermore, we achieved these gains without adversely affecting utilization. We also increased same-store rental volume and added 200,000 new customers, bringing our base to 1.9 million."

"Although we outpaced our end markets, the fourth quarter and full year results were negatively impacted by higher operating costs as well as continued weakness in market demand. According to Department of Commerce data, private non-residential construction declined 6% in 2003 following a decline of 13% in 2002. In addition, government spending on road and highway construction remained sluggish."

Hicks continued, "Our 2004 plan assumes private non-residential construction will be relatively flat. However, we expect to substantially improve our profitability through a combination of lower interest expense due to our recent refinancings, higher rental rates and contractor supply sales growth. We anticipate diluted earnings per share, excluding charges, of $1.00 to $1.10 in 2004."

"Beyond 2004, a sustained rebound in our principal end markets has the potential to drive earnings significantly higher."

The results above for the fourth quarter and full year 2003 exclude aggregate charges, net of tax, of $320.2 million and $330.4 million, respectively. These charges relate to goodwill impairment, buy-out of equipment leases, debt refinancing, notes receivables write-off, and, in the case of the full year results, vesting of restricted shares granted to executives in 2001. The results above for the fourth quarter and full year 2002 exclude aggregate charges, net of tax, of $217.1 million and $505.4 million, respectively. These charges relate to goodwill impairment, restructuring costs, debt refinancing, and, in the case of the full year results, a change in accounting principle relating to goodwill.

The results for the full year 2003 and the fourth quarter and full year 2002 also exclude the positive impacts on diluted earnings per share of repurchases by the company of its 6 1/2% convertible quarterly income preferred securities. These repurchases added $0.01 to diluted earnings per share for the full year 2003, $0.39 to diluted earnings per share for the fourth quarter of 2002 and $0.47 for the full year 2002.

>Taking into account the excluded items, the company reported GAAP results as follows: a net loss of $305.1 million and a loss available to common stockholders per diluted share of $3.96 for the fourth quarter 2003; a net loss of $258.6 million and a loss available to common stockholders per diluted share of $3.35 for the full year 2003; a net loss of $209.0 million and a loss available to common stockholders per diluted share of $2.33 for the fourth quarter 2002; and a net loss of $397.8 million and a loss available to common stockholders per diluted share of $4.78 for the full year 2002.

83.  On March 15, 2004 one or more of the Individual Defendants caused or allowed United Rentals to file its annual report for fiscal year 2003 on Form 10-K with the SEC. The Company's Form 10-K was signed by the Individual Defendants and reaffirmed the Company's previously announced financial results. Additionally, the Company's Form 10-K contained the following opinion from its independent auditors:

>In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of United Rentals, Inc. at December 31, 2003 and 2002, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2003 in conformity with accounting principles generally accepted in the United States.

84.  Moreover, the Company's Form 10-K for fiscal year 2003 included the following Certifications signed by each of defendants Hicks and Milne:

>2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
>3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report; [...]

85.  On April 21, 2004, one or more of the Individual Defendants caused or allowed the Company to file its annual proxy statement with the SEC. Defendants Gross and Tsai, as members of the Audit Committee, authorized the following representation in the proxy statement:

In connection with the audited financial statements contained in United Rentals' 2003 Annual Report on Form 10-K, the Audit Committee:

- reviewed and discussed the audited financial statements with the Company's management;

- discussed with Ernst & Young LLP, the Company's independent auditors, the matters required to be discussed by Statement of Auditing Standards ("SAS") 61, Communication with Audit Committees, as amended by SAS 90;

- reviewed the written disclosures and the letter from Ernst & Young LLP required by Independence Standard Board Standard No. 1, Independence Discussions with Audit Committees, and discussed with the auditors their independence; and

- based on the foregoing review and discussions, recommended to the board of directors that the audited financial statements be included in the Company's 2003 Annual Report on Form 10-K.

86. On April 22, 2004, one or more of the Individual Defendants caused or allowed the Company to issue a press release entitled "United Rentals Reports First Quarter 2004 Results." The press release stated in part:

> United Rentals, Inc. today reported first quarter revenues of $645 million, an increase of 8.9% compared with $592 million for the first quarter of 2003. Adjusted operating income for the first quarter of 2004 was $39.9 million compared with operating income of $40.2 million for the first quarter of 2003. The adjusted net loss for the first quarter of 2004 was $5.9 million and the adjusted loss per share was $0.08 compared with a net loss of $8.7 million and a loss per share of $0.11 for the first quarter of 2003. The adjusted results for the first quarter of 2004 exclude the charges described below.
>
> Dollar utilization for the first quarter of 2004 was 49.6%, an increase of 3.0 percentage points from the first quarter of 2003. The size of the rental fleet, as measured by the original equipment cost, was $3.7 billion at the end of the first quarter of 2004, essentially the same as at the end of the first quarter of 2003. However, the average fleet size during the first quarter of 2004 was 2% lower than during the first quarter of 2003.
>
> * * *
>
> **General Rentals**
>
> First quarter revenues for the general rentals segment were $599 million, an increase of 11.2% compared with $539 million for the first quarter of 2003. Rental rates for the first quarter increased 6.5% and same-store rental revenues increased 8.5% from the first quarter of 2003. Segment operating income for the first quarter was $53.7 million compared with $48.7 million for the first quarter of 2003.
>
> **Traffic Control**
>
> First quarter revenues for the traffic control segment were $45 million, a decline of 14.5% compared with $53 million for the first quarter of 2003. Same-store rental revenues in the first quarter declined 11.7% from the first quarter of 2003. The segment operating loss for the first quarter was $13.8 million compared with $8.4 million for the first quarter of 2003.
>
> **CEO Comments and Outlook**
>
> Wayland Hicks, vice chairman and chief executive officer said, "Adjusted results for the seasonally-slow first quarter improved from last year and were better than our expectations. The improvement was driven by the 6.5% increase in rental rates as well as a 34% increase in contractor supply sales in our general rentals

segment. The positive impact of these factors offset higher general rentals operating costs and declining revenues and profits in our traffic control segment. We also benefited from lower interest expense due to lower interest rates."

Hicks continued, "Following three and a half years of continued decline in our primary end market, first quarter data suggest that private non-residential construction has almost leveled off. For the full year we continue to anticipate diluted earnings per share, excluding charges, of $1.00 to $1.10. However, we're beginning to sense more optimism from our customers that their business has bottomed out and is beginning to turn. If business conditions improve as we go through the year, we would expect better results."

"Beyond 2004, a sustained rebound in private non-residential construction has the potential to drive revenues significantly higher. As that happens, our substantial operating leverage should allow us to grow earnings much faster than revenues."

**GAAP Results and Other Information**

The adjusted net loss data for the first quarter of 2004 excludes $95.2 million of charges, net of tax, relating to the debt refinancing completed in the first quarter of 2004 and a $5.5 million charge, net of tax, for the vesting of restricted shares granted to executives in 2001. The segment operating income and loss data for the first quarter of 2004 exclude the $7.0 million charge for the vesting of restricted shares which has not been allocated to any segment.

After taking into account the excluded items, the company reported GAAP results for the first quarter as follows: operating income of $32.9 million, a net loss of $106.6 million, and a loss of $1.38 per share.

The projected results above for 2004 exclude the first quarter charges described above, costs related to debt refinancing incurred in the second quarter (approximately $11.5 million) and any non-cash goodwill write-offs and other special charges that may be required.

87.   On May 10, 2004, one or more of the Individual Defendants caused or allowed United Rentals to file its report for the quarterly period ended March 31, 2004, on Form 10-Q with the SEC. The Company's Form 10-Q was signed by defendants Milne and Sherk and reaffirmed the Company's previously announced financial results. Moreover, the Company represented the following:

The Consolidated Financial Statements of the Company included herein are unaudited and, in the opinion of management, such financial statements reflect all adjustments, consisting only of normal recurring adjustments, necessary to present fairly the results of the interim periods presented. Interim financial statements do not require all disclosures normally presented in year-end financial statements, and, accordingly, certain disclosures have been omitted.

88.   Additionally, the Company's Form 10-Q for the quarterly period ended March 31, 2003, included the following certifications signed by each of defendants Hicks and Milne:

   2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

   3. Based on my knowledge, the financial statements, and other financial information included to this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report; […]

  89. On July 21, 2004, one or more of the Individual Defendants caused or allowed the Company to issue a press release entitled "United Rentals Reports Second Quarter Results and Raises 2004 Outlook." The press release stated in part:

> United Rentals, Inc. today reported second quarter revenues of $776.0 million, an increase of 6.6% compared with $728.1 million for the second quarter of 2003. Operating income for the second quarter of 2004 was $107.1 million, an increase of 13.2% compared with $94.6 million for the second quarter of 2003. Adjusted net income for the second quarter of 2004 was $41.5 million and adjusted diluted earnings per share was $0.42 compared with net income of $23.4 million and diluted earnings per share of $0.25 for the second quarter of 2003. After recognizing a $6.5 million charge, net of tax, relating to the debt refinancing completed in the second quarter of 2004, the company reported GAAP net income of $35.0 million and GAAP diluted earnings per share of $0.36.

     \* \* \*

> **CEO Comments and Outlook**
>
> Wayland Hicks, chief executive officer said, "Our adjusted diluted earnings per share this quarter were up 68% from last year's second quarter and exceeded our expectations. These results reflected the strong operating performance in our general rentals segment and a substantial reduction in interest expense due to recent refinancings, partially offset by disappointing results in traffic control."
>
> "In general rentals, the 11.9% increase in total revenues included a 9.6% increase in same store rental revenues, which was largely driven by our success in raising rental rates by 7.9%. This performance significantly outpaced our principal end market, private non-residential construction, which was up only slightly during the first five months of 2004. The impact of the revenue growth on profitability was enhanced by our operating leverage, resulting in general rentals operating income growth of 33.6%."
>
> Hicks continued, "As a result of our positive rental rate trend and lower interest expense, we are raising our full year outlook for diluted earnings per share, excluding charges, to $1.20 from the previous range of $1.00 to $1.10."

  90. On August 9, 2004, one or more of the Individual Defendants caused or allowed United Rentals to file its report for the quarterly period ended June 30, 2004, on Form 10-Q with the SEC. The Company's Form 10-Q was signed by defendants Milne and Sherk and reaffirmed the Company's previously announced financial results and represented the following:

> The Consolidated Financial Statements of the Company included herein are unaudited and, in the opinion of management, such financial statements reflect all adjustments, consisting only of normal recurring adjustments, necessary to present fairly the results of the interim periods presented. Interim financial statements do not require all disclosures normally presented in year-end financial statements, and, accordingly, certain disclosures have been omitted.

91. Additionally, the Company's Form 10-Q for the quarterly period ended June 30, 2004, included the following Certifications signed by each of defendants Hicks and Milne:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report; [...]

## THE TRUTH BEGINS TO EMERGE

92. On Wednesday, August 25, 2004, United Rentals received a letter from the SEC that transmitted a subpoena requesting certain of the Company's documents, both of which referred to an SEC investigation entitled *In the Matter of United Rentals, Inc.* The documents requested suggested a broad-based inquiry into the Company's accounting practices.

93. The Company did not disclose the SEC inquiry until five days later. On Monday, August 30, 2004, the Company issued a press release entitled "United Rentals to Cooperate with SEC Inquiry." United Rentals announced that it had received notice that the SEC was conducting a non-public, fact-finding inquiry of the Company. The notice was accompanied by a subpoena requesting the production of documents relating to certain of the Company's accounting records. United Rentals stated it "intends to cooperate fully with the SEC."

94. On August 30, 2004, *Bloomberg* ran an article commenting on the SEC probe that stated in part:

> United Rentals Inc., North America's largest equipment-rental company, said it received a subpoena from the U.S. Securities and Exchange Commission for some of its accounting records. Its shares fell 22 percent.
>
> The SEC is conducting a "fact-finding" inquiry and didn't specify the purpose of the search, Greenwich, Connecticut-based United Rentals said. The company is cooperating with the SEC and said the inquiry doesn't include charges of wrongdoing. SEC spokesman John Nester declined to comment on the subpoena.

> The SEC may be investigating the way United Rentals accounts for $495.1 million in accounts receivables as of June 30 or for goodwill, said Sean Egan, managing director of EJR Research in Haverford, Pennsylvania.
>
> "Those are some of [the] items that stick out as needing some attention," Egan said in an interview. "What we've seen with other companies is that they delay recognition of bad accounts receivable. There's no evidence that that's the case here, but that's an area that can be manipulated. Likewise with goodwill."
>
> Egan said he doesn't own United Rentals shares or bonds. The ratings firm has a "BB" rating on the company's debt.
>
> Shares of United Rentals fell $4.39 to $16 as of 4 p.m. in New York Stock Exchange composite trading. The shares have fallen 17 percent this year.
>
> **Meeting with SEC**
>
> United Rentals spokesman Chuck Wessendorf said the company is scheduling a meeting with the SEC and hasn't yet turned over the accounting records.
>
> "We won't know (what records to disclose) until we talk to the SEC," Wessendorf said in an interview. He declined to be more specific.
>
> The company's chief executive officer and co-founder, Bradley Jacobs, resigned last year and was replaced by Vice Chairman Wayland Hicks. The company had net losses in 2003 and 2002 because of a slowdown in non-residential and highway construction and lower rental prices.

95.  News of the SEC inquiry caused United Rentals' share value to fall 21.53 percent, closing at $16.00 per share on August 30, 2004 on unusually heavy trading volume.

96.  On August 31, 2004, CBS *MarketWatch* issued a press release entitled "United Rentals Extends Stock Slump after SEC Inquiry." The press release stated in part:

> United Rentals' stock lost more ground Tuesday in the wake of news that the Securities and Exchange Commission requested accounting documents from the company.
>
> Shares of Greenwich, Conn.-based United Rentals, which dropped more than 21 percent in the previous session, lost another $1.31, or 8.2 percent, to $14.69 in volume of 6 million shares.
>
> \* \* \*
>
> ***"With our long-standing concerns about United Rentals' financial reporting, we view a broad SEC investigation as more of a concern versus a more specific inquiry."***
>
> Smith Barney said the company's near-term business prospects appear to be improving due to rising rental rates, but said it remains cautious about the company's long-term financial position.
>
> According to the research firm, United Rentals over eight years has generated a negative $81 million in free cash flow.

- 37 -

97.     On September 28, 2004, one or more of the Individual Defendants caused or allowed United Rentals to file with the SEC a Form 8-K which, among other items, stated the following:

> As previously disclosed in the Company's 10-Q report for the quarter ended June 30, 2004, the goodwill balance associated with the Company's traffic control business amounted to $140.5 million as of the end of such quarter. The Company is continuing to see weakness in its traffic control business during the third quarter and, as a result, believes it likely that it will record a significant non-cash goodwill impairment charge in this period. Although the Company has not yet completed its analysis and, accordingly, cannot at this time quantify the amount of such write-off, it expects that such write-off is likely to have a material adverse affect on its results of operations for the third quarter and full-year 2004.

98.     On March 14, 2005, one or more of the Individual Defendants caused or allowed the Company to issue a press release entitled "United Rentals Expects to Meet or Exceed Its 2004 Outlook; Delays Form 10-K Filing; Releases Selected Unaudited 2004 Financial Data; Announces Restatement of Pre-2004 Results to Reduce Income Tax Expense." Among other things, the press release noted that the Company had formed a "special committee of independent directors" to deal with the SEC inquiry, and provided, in pertinent part:

> The company will delay finalizing its 2004 results and filing its Report on Form 10-K to allow additional time to review matters relating to the previously announced SEC fact-finding inquiry. The company believes this delay will extend beyond the Form 10-K due date, including the 15-day extension period....

\* \* \*

**SEC Non-Public Fact-Finding Inquiry**

As previously announced, the SEC is conducting a non-public fact-finding inquiry of the company. The company is cooperating with the SEC, continues to provide information to the SEC and has formed a special committee of independent directors with separate counsel to review matters relating to the SEC inquiry. The inquiry appears to relate to a broad range of the company's accounting practices and does not seem to be confined to a specific time period.

**Restatement of Financial Results for Prior Periods to Reduce Income Tax Expense and Other Items**

During testing of the company's internal controls, as required by Section 404 of the Sarbanes-Oxley Act, the company determined that the provision for income taxes was higher than required for periods prior to 2004. The company has not finally determined the impact this will have on specific periods, but estimates the correction of this will result in a decrease in the provision for income taxes for prior years by a total of approximately $25 million, with a corresponding increase in net income.

The company expects that it will restate its financial statements for the years 1999 through 2003 to correct the income tax provision. Accordingly, investors are cautioned not to rely on the company's historical financial statements. For additional

>information, please refer to the company's Current Report on Form 8-K filed with the SEC on March 14, 2005.
>
>The company has determined that the control deficiencies that resulted in the income tax provision being higher than required represented a material weakness in the company's internal controls over financial reporting at December 31, 2004. The company believes that it has taken adequate measures to remedy this weakness.
>
>As previously reported, the company identified a material weakness in the third quarter partially relating to its self-insurance reserve estimation and evaluation process. The company is conducting additional testing of the process and reserve levels in 2004 and prior periods.
>
>The company is also evaluating whether a material weakness exists relating to a deficiency in reconciling physical inventory quantities to accounting records for certain types of bulk rental equipment inventory, which had an unreconciled difference of approximately $4 million.
>
>The company does not believe that any deficiency that has been identified, including the ones noted above, would adversely impact the 2004 outlook or the selected unaudited financial data provided in this press release. However, the company's evaluation and testing of internal controls, including testing of any remediation of deficiencies, has not yet been completed. There can be no assurance as to the outcome of this testing or that additional material weaknesses will not be identified or adjustments required.

99.   On March 24, 2005, one or more of the Individual Defendants caused or allowed United Rentals to file Form 8-K with the SEC, which announced that the Company had obtained a waiver of certain defaults from its lenders arising from the delay in the Company filing its 2004 Form 10-K, and that the lenders had extended the deadline to June 29, 2005, for the Company to provide 2004 audited financial statements. The Company agreed to pay an unspecified sum to reimburse the lenders for their out-of-pocket expenses incurred in connection with the waiver, including the reasonable fees, charges and disbursements of counsel for the lenders.

100.   On July 14, 2005, one or more of the Individual Defendants caused or allowed United Rentals to issue a press release entitled "United Rentals Board Determines John Milne, President and CFO, Failed to Perform Duties." The press release provided in relevant part:

>United Rentals, Inc. today announced that its board of directors determined that John Milne, the company's president and CFO, failed to perform his duties and this failure would constitute cause for termination if not cured in accordance with his employment agreement. This action was taken on the recommendation of the special committee of the board reviewing matters relating to the previously disclosed SEC inquiry of the company, after Mr. Milne informed the committee he was not willing at this time to respond to the committee's questions. The board notified Mr. Milne that, to the extent his failure of performance may be curable, he would be afforded the thirty-day cure period provided by his employment agreement.

The company also provided an update on the special committee's review. In addition, the company provided updates on the previously disclosed self-insurance reserve review and income tax restatement.

The company also affirmed previous diluted earnings per share expectations for full year 2005 of $1.60 to $1.70.

**Update on Special Committee Review Relating to SEC Inquiry**

In the years 2000, 2001, and 2002, the company was party to several short-term, equipment sale-leaseback transactions that resulted in the company reporting aggregate gross profit from these transactions of $12.5 million, $20.2 million and $1.5 million in those respective years. Although no final conclusion has been reached, the special committee has developed information that suggests the accounting for at least some of these transactions was incorrect. The special committee is continuing to review these transactions as part of its broader review relating to the SEC inquiry. As previously disclosed, the SEC inquiry appears to relate to a broad range of the company's accounting practices and is not confined to a specific period or the matters discussed in this release.

**Update on Other Matters**

Self-Insurance Reserve Restatement Expected

As previously announced, the company is reviewing its self-insurance reserve recorded in 2004 and prior years. The company retained an independent actuary to assist with this matter. Based on work completed to date, the company has concluded that, although the reserve level at year-end 2004 is appropriate, a portion of the reserve recorded in 2003 and 2004 should have been recorded in prior periods. As a result, the expense associated with the self-insurance reserve was too high in 2003 and 2004 and too low in 2002 and prior years.

The company is presently quantifying by reporting period the financial restatement necessary. ***When this review is completed, the company expects to restate its financial statements for 2000 through 2003 and the first nine months of 2004 to correct the expense associated with the self-insurance reserve.*** This restatement will have a positive impact on pre-tax results for 2003 and 2004 and a negative impact on pre-tax results for prior years.

***As previously announced, in the third quarter of 2004 the company identified a material weakness relating partially to its self-insurance reserve estimation and evaluation process.*** Self-insurance reserves reflect the company's estimate of the liability associated with workers' compensation claims and claims by third parties for damage or injury caused by the company. The company subsequently retained an independent actuary to assist in reviewing its historical reserve levels. The company has determined that deficiencies relating to its self-insurance reserve estimation process represented a material weakness in the company's internal control over financial reporting at December 31, 2004. The company believes that it has taken adequate measures to remedy this weakness.

Update on Previously Announced Income Tax Restatement

The company announced in March 2005 that it expected to restate its financial statements for years prior to 2004 to correct the provision for income taxes. The company's initial estimate was that this restatement would decrease the provision for income taxes by a total of approximately $25 million for years prior to 2004.