Subsequently, the company determined that additional analysis is required to quantify the restatement for periods prior to 2004. Accordingly, the company is withdrawing its prior estimates relating to this matter. The company continues to believe the restatement is likely to decrease aggregate income tax expense for periods prior to 2004, although the expense in particular periods could increase. Further analysis is required to confirm this conclusion.

The company believes that this restatement will not impact 2004.

Caution on Historical Financial Statements

***In view of the expected restatements for income tax and self insurance, as well as the matters discussed above relating to certain sale-leaseback transactions, investors are cautioned not to rely on the company's historical financial statements.***

101.    Also on July 14, 2005, *Reuters* published an article entitled "United Rentals says president/CFO failed to perform."  The article stated in part:

United Rentals Inc., which last year disclosed a regulatory probe of its accounting, on Thursday said its board of directors found that President and Chief Financial Officer John Milne had failed to perform his duties and could be fired.

Milne has refused to answer questions from a special committee that has been reviewing accounting related to a Securities and Exchange Commission inquiry, the company said.

A spokesman for Milne said his lawyers have advised him it would be "careless" for him to meet with the committee to discuss matters that occurred several years ago.

The world's largest equipment rental company said that Milne's failure to answer the committee's questions will be cause for termination if not rectified within 30 days.

"If he were to cooperate with the special committee, the board would likely meet again to determine whether he has performed his duties properly," said United Rentals spokesman Chuck Wessendorf.

Shares of United Rentals fell 9 percent in early afternoon trade. The company said it expects to restate results for the years 2000 to 2003, and for the first nine months of 2004. It affirmed its 2005 full-year forecast.

United Rentals said the SEC inquiry is not limited to the period or topics discussed in its Thursday press release, which included various accounting matters.

***John Novak, a Morningstar analyst, said United Rentals' latest disclosure was "another indication of confusion surrounding the company's accounting, and it's an indication of internal chaos when the CFO and the board are negotiating through the press.***

***"They can't quantify or describe what this SEC investigation is about because it's so broad," Novak added, saying the company has not been forthcoming with details on the probe, refusing to take questions on the issue***

*during a recent analyst conference call. Morningstar is advising individual investors to avoid the company.*

UBS analyst David Bleustein, in a research note, said, "A key question on investors' minds will be why is Mr. Milne not willing to immediately respond to the committee's questions?"

\* \* \*

Shares of United Rentals were down $1.86 at $18.35 in afternoon trading on the New York Stock Exchange.

ACCOUNTING ISSUES

The company detailed a range of accounting issues that will be reflected in a restatement of past results.

United Rentals expects to restate self-insurance reserves for prior years, and said the original reserve estimates reflected weakness in internal controls. It said it has taken adequate steps to improve financial controls.

It said the reserves were too high for 2003 and 2004 and too low in 2002 and earlier periods.

The company also withdrew its previous estimates of an income tax provision for years prior to 2004. It had said in March a restatement would decrease the provision by about $25 million, but said Thursday it needs more analysis to determine the restatement, which will not affect 2004 results.

It also said its special committee determined that accounting for some short-term equipment sale-leaseback transactions was incorrect in 2000, 2001 and 2002. The company, which reported aggregate gross profit from the transactions of $34.2 million, said it has not reached a final conclusion about whether a restatement will be needed for these transactions.

102.    About a month later, United Rentals announced that the Board had taken action to terminate defendant Milne's employment with the Company. In a Form 8-K filed with the SEC on August 16, 2005, the Company stated that its Board had terminated defendant Milne's employment agreement as of that day and requested that he resign as a director.[2] The Form 8-K stated that "[t]he board took this action because, as previously announced, Mr. Milne has been unwilling to respond to questions of the special committee of the board reviewing matters relating to the previously disclosed SEC inquiry of the company." Although the Form 8-K stated that Company did not pay

---

[2] Defendant Milne resigned as a director effective August 29, 2005. *See* Form 8-K filed by United Rentals with the SEC on or about August 30, 2005. The Company hired non-defendant Martin E. Welch III as its interim CFO from September 12, 2005, until March 7, 2006, when he was appointed as the Company's Executive Vice President and CFO.

defendant Milne any severance pay, it indicated that he was still "entitled to receive an annual incentive bonus for 2004 ... in an amount to be determined .... The maximum bonus which he is eligible to receive ... for 2004 is $825,000." Finally, the Form 8-K indicated that United Rentals intended to repurchase Milne's shares and warrants to purchase shares for $7,037,114, which would result in a pre-tax expense in 3Q:05 of about $5,000,000 to the Company.[3]   The Form 8-K characterized the legal basis of this repurchase as follows:

> The company had the right to repurchase the shares if the company found that Milne
>
> at any time (i) breached any covenant, obligation or understanding with the company or (ii) conducted himself in a manner which adversely affects or could adversely affect the company. The company made such a determination on August 15, 2005 and notified Mr. Milne that it was exercising its repurchase right for all Mr. Milne's securities subject to such right (i.e., 507,251 shares of common stock and warrants to purchase 714,286 shares of common stock). The notice specified that the closing for the repurchase would take place on August 29, 2005.

103.   As the truth emerged about United Rental's improper and untimely financial reporting, the Company's lenders, of course, took notice.  In an effort to avoid default under various debt instruments, the Company announced in a press release and Form 8-K dated September 12, 2005 that it had reached an "agreement in principle" with an ad hoc committee that represented the holders of a variety of notes valued in the aggregate of $1.4 billion from about 60 financial institutions.  The press release stated that the agreement would "allow the company up until March 31, 2006 to regain compliance with the requirement to make timely SEC filings."  The lenders, however, extracted a heavy price for their consent, as the Form 8-K details:

- for the company's 6½% Senior Notes due 2012, 7¾% Senior Subordinated Notes due 2013 and 7% Senior Subordinated Notes due 2014, the company will pay a consent fee of $16.25 per $1,000 principal amount of notes for which consent is provided;

- for the QUIPs securities, the company will pay a comparable consent fee of $0.8125 per $50 of liquidation preference of such securities for which consent is provided; and

---

[3] In an August 15, 2005 press release, the Company stated that defendant Milne had "breached [a] covenant, obligation or understanding with the Company or ... conducted himself in a manner which adversely affect[ed] or could adversely affect the company."  As a result, the press release noted that the Company elected to issue a Call Notice for 507,251 shares of its common stock and had elected to purchase 714,286 shares of common stock that had been issued to him.

- for the company's 1 7/8% Convertible Senior Subordinated Notes due 2023, the conversion rate of the Convertible Notes will be increased from 38.9520 to 44.9438 shares of United Rentals' common stock for each $1,000 principal amount of Convertible Notes.

104.   In SEC filings during September, November and December 2005, the Company announced that it had obtained consents from its lenders to avoid going into default under the terms of various debt instruments, as well as an extension from the NYSE to avoid a delisting action:

(a)   *The costly consents from the lenders*.  On September 23, 2005, in a Form 8-K filed with the SEC, the Company announced that it had obtained consents from its lenders regarding the late SEC filings and entered into "supplemental indentures" on September 19, 2005.  Under the terms of these consents, United Rentals was given until March 31, 2006 "to regain compliance with the requirement to make timely SEC filings."  Tens of millions of dollars, however, had to be spent to obtain these consents.  The Form 8-K states that "[p]ursuant to the terms of the consent solicitation, the company has paid aggregate consent fees of approximately $34 million to holders of its nonconvertible notes and QUIPs securities. In addition to the consent fees, the company incurred transaction costs relating to the consent solicitation of approximately $4 million on a pre-tax basis."

(b)   *Waiver from secured credit facility*.  On November 14, 2005, the Company filed a Form 8-K and press release with the SEC indicating that "the lenders under its secured credit facility have agreed to allow the company until March 31, 2006, to provide 2004 audited financial statements and final financial statements for 2005 interim periods. This agreement is consistent with the previously announced consent by the company's bondholders."  The filing did not indicate whether the Company paid any fees to such lenders to obtain the noted agreement.

(c)   *Consent from NYSE for filing deadline extension*.  In a December 27, 2005, press release, United Rentals announced that it received "an extension for continued listing and trading on the New York Stock Exchange until March 31, 2006. The company will have until that date to file its December 31, 2004 Form 10-K with the Securities and Exchange Commission. If the company does not make this filing by March 31, 2006, the NYSE will initiate suspension and delisting procedures."  The press release also noted that the extension was subject to review by the NYSE.

105.    By November 2005, the costs incurred by the Company to handle the SEC inquiry reached staggering levels.  In a Form 8-K filing by United on November 2, 2005, the Company stated that it "has incurred costs relating to the previously announced Securities and Exchange Commission inquiry and the related special committee review of approximately *$9 million* for the three months ended September 30, 2005, and approximately *$15 million* for the nine months ended September 30, 2005."

106.    On January 26, 2006, in press release and Form 8-K filed with the SEC, the Company announced that Board's "special committee of independent directors" had made certain findings and recommendations relative to the SEC inquiry, and that the Board had acted on the recommendations. The Company disclosed serious accounting irregularities that would require the restatement of its financials and the removal of certain personnel:

(a)     *Sale-leaseback transaction data concealed from auditors*.  Of the seven sale-leaseback transactions reviewed by the special committee between December 2000 and March 2002, the committee determined that "the accounting for six of these transactions involved irregularities and that critical information associated with these transactions was concealed from the company's auditors."  These practices "appear to have been directed by the company's two former chief financial officers."[4]

(b)     *Concealment of concessions to suppliers*.  The special committee found that from the fourth quarter of 2000 through 2002, the Company had entered into a number of "trade package" transactions in which the Company made "commitments or concessions to suppliers" so that they would "buy used equipment at premium prices" above the equipment's "fair value."  Like the sale-leaseback transactions, these improper activities "appear to have been directed by the company's two former chief financial officers."  These trade packages generated booked revenues of $38 million and gross profits of $9 million, but these numbers were highly suspect, because the committee found that:

---

[4] Defendant Nolan was the Company's CFO from the inception of the Relevant Period until December 6, 2002, when he was replaced by defendant Milne, who remained CFO until his termination on or about August 15, 2005.

as a result of instructions given by certain former employees, documents were not created that would have permitted the linkage of the sales and inducements. As a result, the true nature of these transactions was concealed. Because of this lack of documentation, the company is unable to determine the portion of the $9 million gross profit recognized in connection with trade packages ... that was improperly recognized. The company determined that, under the circumstances, disclosure rather than a restatement of its results for those periods is appropriate.

(c)  ***Inadequate purchase accounting practices***. The Company identified a host of long-standing problems:

With respect to the company's practices in valuing equipment acquired in purchase business combinations, the committee concluded that certain of these practices were not adequate between 1997 and August 2000. These included, among other things, the use of inconsistent valuation methodologies, some of which were reflected in memoranda that were not provided to or reviewed by the company's auditors, suggestions contained in those memoranda that improper methods of valuation be used (although the committee did not find evidence that such improper methods were generally applied), inadequate supervision of personnel, inadequate coordination with providers of outside valuations and apparent confusion on the part of one of those providers. Because it was unable to validate the company's reported depreciation expense for, and income recognized on, sales of equipment acquired in purchase business combinations, the committee concluded that certain company personnel (whom the committee was unable to identify) may have sought to manipulate opening balance sheet values for equipment acquired in purchase business combinations by causing them to be understated and that these opening balance sheet values may have been understated by an amount the committee was unable to determine. …

(d)  ***Recommended adverse personnel actions***. The press release stated that "[o]n the committee's recommendation, the board directed the company to remove its corporate controller and principal accounting officer and its vice president – finance from their positions, although there was no finding of intentional wrongdoing on the part of these individuals."[5]

(e)  ***Restatement of financials for prior periods***. The press release noted that the Company expected to restate its financials as noted below.

(i)  *Sale-leaseback transactions*. The press release indicated that the Company expected to restate its financials to correct accounting errors relative to six sale-lease transactions from December 2000 and March 2002. The press release provided the below table that

---

[5] The Company's Form 10-K for FY 2005 filed with the SEC on March 31, 2006, indicated that the Company had "entered into an agreement and general release with Mr. Sherk [the Company's former Controller] in March 2006. Effective as of January 2006, Mr. Sherk ceased to be Vice President, Corporate Controller of the Company. Mr. Sherk will continue to serve as a vice president of the Company."

showed a "preliminary estimate" of the impact of these errors on the Company's pre-tax income.  In the aggregate, the improper accounting was estimated to have had an overall negative impact of $11.2 million on the Company's pre-tax income:

|  | Increase/(Decrease) |
| Year Ended December 31, | in Pre-tax Income (Loss) |
| --- | --- |
| 2000 | $            (12.2) |
| 2001 | (19.4) |
| 2002 | 3.4 |
| 2003 | 17.0 |

(ii)    *Self-insurance reserve restatement.*  The press release stated that the Company expected to restate its financials for 2000-2003 and the first nine months of 2004 "to correct the expense associated with the self-insurance reserve.  The company estimates that this expense was overstated by approximately $38.5 million and $8.1 million in 2004 and 2003, respectively, understated by $13.3 million in 2002 and understated by $40.7 million in the aggregate in 2001 and prior years."  Thus, according to these estimates, for the years prior to 2004 and up to the end of the third quarter for FY 2004, United Rentals had understated its aggregate self-insurance expense by some $7.7 million.

(iii)    *Income tax restatement.*  The press release announced that the Company's "income tax provision was understated by approximately $0.2 million and $10.4 million in 2004 and 2003, respectively, and understated in prior years, in the aggregate, by approximately $7.1 million."  Thus, for the years up to and including 2004, the Company's improper financial practices led to a total understatement of income tax liability of about $17.7 million.

(iv)    *Equipment rental revenue restatement.*  The press release stated that the Company decided to change its accounting to a straight-line method for equipment rental transactions.  As a result, the release stated that the Company intended to restate its financials with the below-described estimated impact.  Based on the estimate aggregate impact, the Company had overstated its equipment rental revenues by some $7.8 million from 2001-04.

| | Previously Reported Equipment Rental Revenues | Increase/(Decrease) in Equipment Rental Revenues | Percent Change |
| --- | --- | --- | --- |

| | | | | |
|---|---|---|---|---|
| 2001 | $ | 2,212.9 | $  3.2 | 0.14% |
| 2002 | | 2,154.7 | (2.7) | (0.13) |
| 2003 | | 2,177.5 | (1.5) | (0.07) |
| 2004 | | 2,302.2 | (6.8) | (0.30) |

       (v)    *Operating expense reclassification*: The press release stated that the Company had made errors in how it had been accounting for equipment lease buy-outs:

> The company has determined that $88 million of costs for the year ended 2003 previously classified below operating income should be reclassified and included in operating income. This amount primarily represents the amount in excess of the fair value related to the buy-out of equipment under operating leases. The company expects to reflect this reclassification in its restated financial statements. This reclassification will have no impact on 2003 net income or earnings per share.

       107.    In a press release dated March 31, 2006, United Rentals announced that it had filed its Forms 10-K for FY:04 and FY:05 with the SEC, but noted that the filing of its quarterly Forms 10-Q would be delayed until mid-April.  The press release (together with a Form 8-K filed with the SEC that same day) also noted an "additional restatement" of the Company's financials would be necessary, which was

> related to the allocation of the purchase price of acquisitions completed since July 2001. A review of those transactions indicated that a portion of the purchase price allocated to goodwill (which is not amortized) should have been recorded as a separate intangible asset – customer relationships (which is amortized). As a result of this additional restatement, the company's financial results filed today reflect an annual decrease in reported pre-tax income of approximately $3 million in 2005 and 2004, $2 million in 2003 and $1 million in 2002.

Thus, these further accounting errors again shrunk the Company's reported pre-tax income by at least $6 million in the aggregate from 2002-2005.  As a result of this restatement, the Form 8-K cautioned investors "not to rely on the Company's historic financial statements."  The annual Form 10-K reports, the Form 8-K noted, would reflect these restatements.

      108.    On March 31, 2006, United Rentals finally filed its Forms 10-K for FY:04 and FY:05.  Both documents provided confirmation that the Company had suffered from long-standing problems in its financial controls.

       (a)    ***Specific areas restated on financials***.  The Company's Form 10-K for FY:05 admitted irregularities in the following areas that required a restatement of previous financial reports:

(i)      *Equipment rental revenues.*  The Form 10-K for FY:04 noted that the originally-reported results "reflected the recognition of equipment rental revenues based on the minimum amounts which became due and payable under the terms of ... applicable rental contracts. Because the Company now recognized such revenues on a straight-line basis, a restatement of the financials was required that had the "impact of increasing/(decreasing) originally reported pre-tax income for 2001, 2000 and for periods prior to 2000 by $6, $4 and $(27) [million], respectively."

(ii)     *Sale-leaseback transactions.*  In fiscal years 2002, 2001 and 2000, the Company recognized profits of $1 million, $20 million and $12 million, respectively, on six sale-leaseback transactions.  The Form 10-K for FY:05 indicated that the Company had "recognized a premium (excess profit above fair value) on these transactions. In exchange for receiving this profit premium, [the Company] agreed to disburse cash in later periods as well as pay premiums for subsequent equipment purchases ("subsequent purchases")."  Recognizing this practice as improper, the Company restated its financials, which "had the impact of increasing/(decreasing) originally reported pre-tax income for 2003, 2002, 2001 and 2000 by $20, $2, $(21), and $(12) [million], respectively."  The Form 10-K for FY:05 also stated that the adjustments required by the restatement "reflect[ed] the elimination of the premium originally received in the minor sale-leaseback transactions as well as the deferral of any profit until all of [the Company's] obligations associated with the originally received premiums were settled. Additionally, the adjustments reflect a reduction in previously recorded depreciation expense because this expense reflected capitalized equipment costs for subsequent purchases that were overstated."

(iii)    *Self-insurance reserves.*  According to the Company's Form 10-K for FY:05, United Rentals was required to restate its financials for self insurance, with the impact described as follows in the Form 10-K:

> We self-insure for certain types of claims associated with our business, including (i) workers compensation claims and (ii) claims by third parties for injury or property damage caused by our equipment or personnel. These types of claims may take a substantial amount of time to resolve and, accordingly, the ultimate liability associated with a particular claim may not be known for an extended period of time. Our prior methodology for developing self-insurance reserves was based on management estimates of ultimate liability which were developed without obtaining actuarial valuations. In 2004, management adopted an estimation approach based on third party actuarial calculations that properly reflects and incorporates actuarial assumptions. Based on actuarial calculations performed by our third party actuaries

in late 2004 and 2005, we concluded that the estimation process we previously used did not adequately take into account certain factors and that, as a result, a restatement was required. The factors that were not adequately addressed by our historical estimation process included future changes in the cost of known claims over time, cost inflation and incurred but not reported claims. Our restatement for the self-insurance reserves had the impact of increasing/(decreasing) originally reported pre-tax income for 2003, 2002, 2001, 2000 and for periods prior to 2000 by $8, $(13), $(11), $(18) and $(12) [million], respectively.

       (iv)   *Customer relationships*.  The Company restated its financials for customer relationships as described in its Form 10-K for FY:05:

In 2001, the FASB issued Statement of Financial Accounting Standards No. 141, "Business Combinations" ("SFAS No. 141"), which required the use of the purchase method of accounting for business combinations and prohibited the use of the pooling of interests method. SFAS No. 141 also changed the definition of intangible assets acquired in a purchase business combination, providing specific criteria for the initial recognition and measurement of intangible assets apart from goodwill. SFAS 141 applied to all business combinations accounted for using the purchase method for which the acquisition date is July 1, 2001 or later.

We have reviewed acquisitions we made since July 1, 2001 and have determined that a portion of the purchase price for these acquisitions previously allocated to goodwill should be recorded as a separate intangible asset—customer relationships. This restatement reflects the amortization expense associated with the reallocation of a portion of the purchase price from goodwill (which is not amortized) to customer relationships (which are amortized). This correction of an error had the impact of decreasing originally reported pre-tax income for 2003 and 2002 by $2 and $1[million], respectively.

       (v)   *Income taxes*.  According to Form 10-K for FY:05, income taxes were restated on Company financials "to (i) correctly reflect all book-to-tax temporary differences (primarily depreciation and nondeductible reserves and accruals); (ii) reflect appropriate tax benefits for net operating loss and alternative minimum tax credits; (iii) calculate deferred taxes at appropriate legal entity tax rates; and (iv) account for the settlement of an IRS audit examination." These restated income tax provisions "had the impact of increasing/(decreasing) originally reported net income for 2003, 2002, 2001, 2000 and for periods prior to 2000 by $(10), $1, $(3), $(2) and $(4) [million], respectively."

       (b)   ***The Company's misleading characterization of the impacts of the restated financials***.  The Company's Form 10-K for FY 2005 claimed that the restated financials actually decreased its net loss for 2003, but admitted a negative impact of $65 million on the fiscal years prior to January 1, 2002:

- 50 -

The Restatement had the effect of increasing our net loss and net loss per diluted share for 2002 by $8 million and $.10, respectively, and decreasing our net loss and net loss per diluted share for 2003 by $5 million and $.06 per share, respectively. The impact of the Restatement on periods prior to January 1, 2002 is reflected as a decrease of $65 million to beginning retained earnings as of January 1, 2002.

(c)      *The hidden, but enormous, impact of other recharacterized transactions*.

The Company's Form 10-K for FY:05 also noted other areas involving recharacterized transactions that did not lead to a formal restatement. These areas nevertheless involved significant negative impact on United Rentals that the Individual Defendants spun as misleadingly benign:

(i)      *Buy-out of operating lease*. The Form 10-K indicated that $88 million of costs for FY:03 that had been "previously classified below operating income should be reclassified to cost of equipment revenues and included in operating income. This amount primarily represents the amount in excess of the fair value related to the buy-out of equipment under operating leases." The reclassification of these costs, according to the Form 10-K, had the "effect of reducing gross profit and other expense (income), net by $88 [million]," but the Form also claimed that such action had "has no impact on originally reported net income or earnings per share for" FY:03. This spin is at best inaccurate and, at worst, a blatant attempt to further mislead the shareholders and general public about the profitability of its operations. When the reclassified $88 million of costs and restated financials are taken into account *only as to their effect on stated operating income or loss*, the Company's operations for FY:03 show an astounding $66 million drop from net operating income of $30 million to a net operating loss of $36 million following the restatement. By advertising a "net loss" showing a only a $5 million decrease, the Individual Defendants glossed over this situation. They apparently came up with a $5 million decrease by taking the $36 million net operating loss and then adding back in: (a) interest expense; (b) certain dividends; (c) other income or expense; (d) a loss before provision for income taxes and the cumulative effect of a change in the Company's accounting principles; and (e) a provision (benefit) for income taxes. Of these amounts, one figure stands out: the "other income or expense" category. As originally reported for FY:03, the Company reported other expenses of $133 million. As restated, the "other expense" category dropped to $43 million – a $90 million decrease. In other words, by manipulating this "other expense" category – which, by definition, should have nothing to do with operating income or

- 51 -

loss[6] – the Individual Defendants were able to wholly gloss over the severe, negative impact of the restated financials on its actual operating income or loss.

         (ii)    *Trade practices*.   The Form 10-K for FY:05 admitted that the Individual Defendants improperly induced suppliers to buy used equipment at premium prices, with such transactions being directed by former CFOs Nolan and Milne:

> During the period from the fourth quarter of 2000 through 2002, the Company sold used equipment to certain suppliers (referred to as "trade packages"). In certain of the trade packages, prices may have included a premium above fair value. In order to induce these suppliers to buy used equipment at premium prices, the Company made commitments or concessions to the suppliers. It has been determined that the accounting for those transactions involved irregularities and that the Company improperly recognized revenue from the transactions involving the undisclosed inducements. However, because records were not created that would have permitted the linkage of the sales and inducements (as a result of instructions given by certain former employees of the Company), the Company is unable to determine the portion of the revenue and gross profit recognized in connection with trade packages with these suppliers between 2000 and 2002 that was improperly recognized. During this period, all sales of used equipment to these suppliers (which includes all trade package transactions) generated total revenues and gross profits of $38 and $9 [million], respectively. Notwithstanding the lack of records relating to these transactions, the Company believes that its financial statements from and after 2002 are materially correct with respect to the effect of these transactions.

> The Special Committee concluded that, based on the evidence it reviewed, the practices regarding certain trade packages and minor sale-leaseback transactions described above appear to have been directed by the Company's two former chief financial officers. Both of these individuals, who are no longer with the Company, declined to cooperate with the Special Committee's investigation. Based upon recommendations of the Special Committee, the Company's board of directors directed the Company, among other things, to evaluate potential claims relating to certain former company personnel, including these individuals and compensation and benefits previously received by them described elsewhere in this report.

         (iii)    *Understated equipment values relative to acquisitions of other companies*.   The Form 10-K for FY:05 noted that United Rentals' explosive growth from 1997-2001 resulted from hundreds of acquisitions of other rental equipment companies.  The Form 10-K noted that the Board's Special Committee found as follows:

---

[6] The Company's Form 10-K for FY:05 states that the "2003 other expense of $43 [million] includes $29 [million] of charges incurred in connection with the redemption of previously issued senior subordinated notes as well as an $11 [million] write-off of notes receivable that were deemed impaired.  The charge related to the redemption of notes primarily reflects the redemption price premium and the write-off of previously capitalized financing costs related to such notes.  The charge associated with the notes receivable write-off relates to notes received as consideration for non-core assets that were disposed in prior years."

[C]ertain of these practices were not adequate between 1997 and August 2000[,] [which] included, among other things, the use of inconsistent valuation methodologies, some of which were reflected in memoranda that were not provided to or reviewed by the Company's auditors, suggestions contained in those memoranda that improper methods of valuation be used (although the committee did not find evidence that such improper methods were generally applied), inadequate supervision of personnel, inadequate coordination with providers of outside valuations and apparent confusion on the part of one of those providers. The Special Committee concluded that certain Company personnel (whom the committee was unable to identify) may have sought to manipulate opening balance sheet values for equipment acquired in purchase business combinations by causing them to be understated and that these opening balance sheet values may have been understated by an amount the committee was unable to determine.

The Form 10-K admitted that the deficiencies described above "may have resulted in inaccurate values being ascribed to rental equipment that [the Company] acquired in purchase business combinations, including in some cases values that may have been below fair value." The Company asserted, however, that it did "not have the ability to revalue this equipment because [the Company is] unable to currently determine its historical physical condition and the records that currently exist for this equipment are not sufficient to establish the physical condition of the equipment at the time of its acquisition." Based on various hypothetical assumptions, the Form 10-K for FY:05 noted that the negative impact of these understated equipment values for FY:97 through FY:05 ranged into the many millions of dollars.

(d) ***Confirmation of huge amounts paid to extract concessions from creditors and other interested parties to avoid default as a result of untimely SEC filings***. The Company's Form 10-K for FY:05 detailed obligations of the Company with respect to the indentures governing certain notes, which require annual and other period reports to be filed by the Company with the SEC. The Form noted that on September 19, 2005, the Company obtained similar consents from the lenders to waive the defaults associated with the Company's untimely SEC filings and give it an extension under amended indentures until March 31, 2006 to so file. *To obtain these consents, the Company had to pay "aggregate consent fees" of $34 [million]*, which "costs are being amortized through the maturity dates of the nonconvertible notes .... Amortization expense recorded in 2005 for these costs was $1 [million]." United Rentals also obtained a default waiver from its lenders on the New Credit Facility, *which cost the Company yet another $1 million*.

- 53 -

(e)    ***Further delay in reporting; inability to rely on prior financials***.   The

Company cautioned that, as of March 31, 2006, it still had not filed any of its quarterly Form 10-Qs

for FY:05, and that as a result, it was in violation of its amended indentures relative to the untimely

filing.  Further, the Company stated that as it had not amended its Form 10-K or Form 10-Q reports

for periods affected by the restated financials that ended on or prior to September 30, 2004, "the

financial statements and related financial information contained in those reports should not be relied

upon."

(f)    ***Company subject to an ongoing, expensive SEC inquiry with an uncertain***

***outcome***.  The Company cautioned its investors that the SEC inquiry could have a major impact on

the Company's business, and that it was likely to continue to incur significant expenses in connection

with responding to the inquiry, regardless of its outcome.  In particular, the Form 10-K contained an

item 1B entitled "Unresolved Staff Comments," which stated, in pertinent part:

> In January 2005, we received a comment letter from the SEC relating to our annual report on Form 10-K for the year ended December 31, 2003 and quarterly reports on Form 10-Q for the periods in 2004. We responded to these comments in February and March 2005 and on March 25, 2005, received a letter from the SEC with follow-up comments. These comments addressed accounting and disclosure matters including: (1) our use of the non-GAAP performance measure "adjusted income"; (2) the calculation of the minimum amounts paid by customers for each day's usage as it pertains to our reported revenues; (3) our fixed price contracts and the accounting for those contracts using the percentage-of-completion method; (4) the valuation of rental equipment to be sold; (5) third-party appraisals of rental equipment acquired in purchase acquisitions; (6) the valuation of non-compete agreements, customer-related intangibles and existing leases in purchase acquisitions; (7) our assumptions to determine goodwill impairments; (8) the Company's change in reportable segments and its effect on reporting information; (9) the assessment of success of the Company's restructuring activities and calculation of any net cost savings; (10) the classification of the buy-out of equipment operating leases and write-downs of notes receivable as non-operating expenses; (11) the effectiveness of the Company's disclosure controls and procedures and the disclosure of any deficiencies; (12) the allocation of goodwill upon the adoption of SFAS 142 and any subsequent adjustments to such allocation; and (13) the determination of insurance reserves.

> We have responded to all of these comments other than the comments relating to the valuation of existing leases in purchase acquisitions and adjustments to goodwill subsequent to its initial allocation upon the adoption of SFAS 142, which required additional review, because we have been focused on (1) cooperating with the on-going SEC inquiry and the review of the Special Committee, (2) reviewing and restating our financial statements; and (3) preparing our 2004 Annual Report, our quarterly reports on Form 10-Q for quarters ended in 2005 and this annual report for filing. Accordingly, the staff of the SEC has not yet indicated whether it will have further comment regarding these matters. However, our restatements for customer relationships and equipment rental revenue recognition as well as the reclassification

- 54 -

of the buy-out of an operating lease reflected in our consolidated financial statements included elsewhere in this report reflect these comments. We will continue to work with the SEC to resolve any outstanding comments and we do not currently anticipate any additional restatements will result from the resolution of these comments, although there can be no assurance this will be the case.

109.    In a separation agreement dated March 31, 2006, and attached as an exhibit to the Form 10-K for FY 2005, the Company set forth the terms and conditions of the separation of Joseph Ehrenreich, its former Vice President and General Counsel.   No particular reasons for the termination were specified in the agreement, under which his formal termination date is September 1, 2006.  But as of the date of the agreement through Ehrenreich's formal termination date, his duties were dramatically reduced to minor non-discretionary tasks to be undertaken at the Company's discretion.  In connection with this separation agreement, United Rentals agreed to pay Ehrenreich the following:

(a)    from March 31 through September 1, 2006, Mr. Ehrenreich is to receive his base annual salary of $435,000 and a "non-accountable expense allowance of $4,000 per month";

(b)    a lump sum severance payment of $968,450 on the fifth business day following the effective date of the agreement;

(c)    the lump sum of $1,212,500, which represented the "maximum cumulative value" for the 25,000 units he held under the company's "Long-Term Incentive Plan";

(d)    of the 60,000 shares of restricted stock he owned, he is to forfeit 30,000 shares, but the other 30,000 shares will vest if he remains employed through the termination date of September 1, 2006;

(e)    the lump sum of $327,800 sometime around in April 2006 in lieu of any bonus for FY:05 under the annual incentive compensation plan for Company executives;

(f)    the lump sum of $200,000, payable at the same time he shall receive the lump sum severance payment in (b) above;

(g)    the lump sum of $13,000 in lieu of benefits after the effective date; and

(h)    a lump sum payment equal to 130.156 hours of base salary pay for accrued but unused vacation.

110.    On April 12, 2006, the Company finally filed its long-delayed Forms 10-Q for the FY:05 quarterly periods ended March 31, June 30, and September 30, 2005.  An introductory explanatory note to these reports stated that the Company was unable to timely file these reports "as a result of the previously announced SEC inquiry and related review by a Special Committee of our board of directors and the restatement of our consolidated financial statements for 2003 and 2002." Relative to the Company's accounting and financial controls woes, these three documents contained substantially the same cautionary notes and observations:

(a)    ***Huge outlays to protect the directors and officers***.  The Form 10-Q for the quarterly period ended March 31, 2005, noted that:

> The Company indemnifies its officers and directors pursuant to indemnification agreements and may in addition indemnify these individuals as permitted by Delaware law. Accordingly, in connection with the purported class action lawsuit, three purported shareholder derivative lawsuits and the SEC inquiry and related review of the Special Committee described above, the Company advanced counsel fees and other reasonable fees and expenses, actually and necessarily incurred by the present and former directors and officers who are involved, ***in an aggregate amount of approximately $2.6 [million] during fiscal 2005***. Each of the individuals is required to execute an undertaking to repay such expenses if he or she is finally found not to be entitled to indemnification.

(b)    The Form 10-Q for the quarterly period ended March 31, 2005 documented a host of problematic financial controls quoted below from the report:

> ***Control environment***. We did not maintain an effective control environment over financial reporting. Specifically, we identified the following deficiencies in the control environment, which, in the aggregate, represent a material weakness in the overall control environment:
>
> • There was not sufficiently effective communication of the importance of high standards for internal control over financial reporting. In addition, a former member of senior management maintained the dual role of President and Chief Financial Officer, which further impaired the Company's ability to maintain sufficient emphasis on internal controls over financial reporting;
>
> • We did not maintain a sufficient complement of experienced personnel in key financial reporting functions, including Corporate Finance and Accounting, Tax, Information Technology, and Internal Audit;
>
> • Certain of the Company's corporate governance practices were not effective, including a limited Internal Audit function and lack of effective business ethics training for employees; and
>
> • The Company's alert-line, conflict-of-interest inquiry process and related "whistle-blower" mechanisms were not effective as instances

- 56 -

were noted where follow-up of alleged improprieties and conflict-of-interest responses were not completed timely and effectively.

The material weakness in our control environment described above contributed to the existence of the material weaknesses discussed below.

*Financial statement close process.* Internal controls over the financial statement close process were not effective and represented a material weakness in our internal control over financial reporting. The primary factors contributing to this material weakness were:

- We did not maintain sufficient formal, written policies and procedures governing the financial statement close process;

- We did not maintain effective controls to provide reasonable assurance that accounts were complete and accurate and agreed to detailed support, and that account reconciliations were properly performed, reviewed and approved. Accounts impacted by these deficiencies included stock compensation and deferred rent expense, among others;

- We did not properly analyze and document key assumptions and processes used in determining reserve balances for certain judgmental accounts, including credit memo reserves, contract accounting, accrued bonuses, medical insurance reserves and accounts payable cutoffs, and the analyses supporting recorded balances were not effectively reviewed and approved by appropriate management;

- We did not maintain effective controls over the recording of journal entries, to ensure that entries were properly prepared with sufficient supporting documentation and were reviewed and approved by appropriate management;

- We did not maintain a documented formal management review process of the consolidated interim and annual financial statements; and

- We did not maintain sufficient staffing with appropriate technical competence in the corporate finance and accounting departments.

*Income taxes.* Internal controls surrounding the accounting for income taxes were not effective and represented a material weakness in our internal control over financial reporting. The primary factors contributing to the material weakness in accounting for income taxes were failure to maintain tax basis balance sheets permitting effective reconciliation of cumulative book to tax differences, including book versus tax fixed asset records; failure to annually evaluate state tax rates; and failure to adequately verify data used in computations, particularly as it pertains to historical deferred tax liabilities and assets.

*Self-insurance reserves.* Internal controls pertaining to the self-insurance reserve estimation process were not effective and represented a material weakness in our internal control over financial reporting. The primary factors contributing to these deficiencies was a lack of effective reconciliation of claims data and evaluation of recorded liabilities associated with workers' compensation claims and claims by third-parties for damage or injury caused by the Company.

*Bulk rental assets*. Internal controls regarding the manner that certain types of bulk rental assets are recorded, tracked and relieved from the accounts upon disposal or sale were not effective and represented a material weakness in our internal control over financial reporting. The primary factor contributing to the material weakness was a deficiency in the perpetual inventory system which did not provide for complete data regarding bulk rental asset quantities and unit costs, which in turn impaired the ability to compute depreciation expense, record accurate cost of sales upon disposal and to complete fully effective physical inventories of these bulk rental assets.

As a result of the material weaknesses described above, our management has concluded that the Company did not maintain effective internal control over financial reporting as of March 31, 2005 (or as of March 31, 2004).

(c)    The Form 10-Q for the quarterly period ended March 31, 2005 also documented "remediation" efforts made by the Company to try to clean up the mess the Individual Defendants had made of its financial controls and accounting procedures:

**Remediation of Material Weaknesses in Internal Control over Financial Reporting**

During fiscal 2005, we engaged in substantial efforts to address the material weaknesses in our internal control over financial reporting and related ineffectiveness of our disclosure controls and procedures. The following paragraphs describe the on-going changes to our internal control over financial reporting subsequent to December 31, 2004 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting:

To remediate the control environment deficiencies and related material weakness:

- We significantly strengthened management within key financial functions, including the appointment of a new Chief Financial Officer, who joined the Company as Interim Chief Financial Officer in the third quarter of 2005 and was appointed our Executive Vice President and Chief Financial Officer in March 2006, a new Vice President of Internal Audit in the second quarter of 2005, a new Vice President, Assistant Corporate Controller and a Director of Accounting and Consolidations in the third quarter of 2005 and a new Director of Financial Reporting and Analysis in the fourth quarter of 2005. In addition, subsequent to fiscal 2005, in the first quarter of 2006, we hired a new Vice President of Taxes and a new Senior Vice President, Chief Information Officer, and certain former Corporate Finance and Accounting personnel were terminated or removed from their positions;

- To strengthen the Company's corporate governance practices, in January 2005 the Company formed a Compliance Committee to monitor and enhance code of conduct and related matters, including subsequent release of mandatory ethics and compliance training for all employees. Also, in February 2005 we expanded the role and resources of the internal audit function through establishing a co-sourcing internal audit engagement with a global accounting and audit firm and through the subsequent hiring of an experienced Vice

President of Internal Audit who reports directly to our audit committee; and

- Procedures for investigating and resolving allegations of wrong-doing, as reported through the Company's alert-line, were substantially improved through increased access to the audit committee and senior management. Further, administration and monitoring of the conflict-of-interest process was transferred to the Corporate Security function to ensure effective and timely completion of this annual process.

To correct the control deficiencies in our financial statement close process, we took the following actions in 2005:

- We began the process of documenting formal, written policies and procedures governing the financial close process, including implementing formal monthly closing meetings with corporate and region accounting staff;

- We began implementing more formal account reconciliation and analysis processes, including review and approval requirements;

- We began performing additional review and documentation of the assumptions and processes used in determining the reserve balances for judgmental accounts, including accrued bonuses and medical insurance reserves;

- We began implementing more formal journal entry documentation, review and approval requirements and related procedures, to ensure journal entries are properly prepared with supporting documentation and have been appropriately approved; and

- As noted above, we upgraded the corporate finance and accounting staff with the addition of several experienced financial personnel at the Vice President, Director and senior analyst levels.

Several changes in our corporate tax function were adopted to remediate the material weakness in our accounting for income taxes as of December 31, 2005. These included procedures to ensure that the income tax provision and related tax assets and liabilities are reconciled accurately and timely; maintaining tax basis balance sheets and effective reconciliation of the cumulative book-to-tax differences, including book and tax fixed asset records; and annually evaluating the appropriate state tax rates. Additionally, the Company has enhanced communications between business unit, tax and accounting department personnel, and completed, with the assistance of consultants, a thorough analysis of historical acquisitions and other activities supporting deferred tax liabilities and assets. To further strengthen the Company's tax function, a search for an experienced Vice President of Taxes was initiated in late 2005, with successful recruitment of this new hire in January 2006, as mentioned above.

The material weakness pertaining to our self-insurance estimation and evaluation process was remediated as of December 31, 2005 through our engaging qualified, third-party actuaries to perform actuarial calculations of the liabilities for outstanding and incurred-but-not-reported claims, and by properly analyzing and reconciling claims data recorded in the general ledger with the data used by the actuaries. These actuarial calculations incorporate appropriate actuarial assumptions

- 59 -

and represent a substantial improvement from the former practice of estimating our liability with limited actuarial input. This more formal and complete analysis and evaluation of the estimated self-insurance liabilities is now completed semi-annually by the corporate accounting and risk management functions.

To correct the control deficiencies surrounding accounting for bulk rental assets, as of December 31, 2005 the Company completed a thorough analysis of the bulk assets accounting practices within each of our three reportable business segments, and implemented appropriate actions to ensure that the bulk asset accounting properly reflects the transactions within each segment. These actions included standardizing bulk rental asset policies and practices across all locations within each segment, modifying the inventory system and updating procedures to capture asset quantities and unit costs and to properly track bulk rental asset changes.

We believe the foregoing actions have improved and will continue to improve our internal control over financial reporting, as well as our disclosure controls and procedures. However, the material weakness in our financial close process was not remediated by December 31, 2005 and, accordingly, as reported in our Annual Report on Form 10-K for the year ended December 31, 2005 our internal control over financial reporting and our disclosure controls and procedures remain ineffective as of December 31, 2005.

The remediation efforts noted above are subject to the Company's ongoing internal control assessment, testing and evaluation processes. While these remediation efforts continue, we will utilize additional analyses and other detailed procedures and other appropriate measures to assist us with meeting the objectives otherwise fulfilled by an effective internal control environment.

111.    In a press release dated May 9, 2006, the Company indicated that the SEC inquiry was still ongoing and related to a broad range of the Company's accounting practices.

## REASONS THE STATEMENTS WERE IMPROPER

112.    The statements contained herein were each materially false and misleading because the Individual Defendants failed to disclose and indicate that the Company had manipulated its financial results through, *inter alia*, the following: (i) concealment of sale-leaseback transaction information from its auditors, (ii) providing hidden kickbacks to suppliers to induce them to buy used rental equipment at artificially-inflated prices, (iii) permitting inadequate purchase accounting practices that allowed or facilitated the manipulation of transaction values, (iv) permitting the improper recognition of equipment rental revenues; and (v) allowing deficient practices with respect to self-insurance reserves.  As a result of these practices and others alleged herein, the Company's internal controls, accounting procedures and announced financial results were in violation of GAAP, and the Company's financial results were inaccurately stated and materially inflated at all relevant times.